## PEOPLE v. FITZSIMMONS.

### (Court of Sessions, Onondaga County. July, 1895.)

1. PRIZE FIGHT—QUESTION FOR JURY—MANSLAUGHTER.

On a prosecution for manslaughter for a death occasioned by a sparring exhibition, the question of whether the exhibition was within Pen. Code, § 458, declaring to be guilty of a misdemeanor one who does any ·act to further "a contention or fight, * * * or a fight commonly called a ring or prize fight," is for the jury.

2. SAME—INTENT.

In determining whether a homicide was committed by a person while engaged in the commission of a misdemeanor, while he must have had an intent to commit the act which constitutes the misdemeanor, it is not necessary that he intended to violate the law.

Robert Fitzsimmons was indicted for manslaughter in the first degree in causing the death of one Riordon in a sparring match. The jury rendered a verdict of not guilty.

The defendant, a professional pugilist, and one Riordon, who was known as his sparring partner, were advertised on November 16, 1894, to give a sparring exhibition at the Grand Opera House, Syracuse, N. Y. After some preliminary exhibitions by other persons, the defendant and Riordon appeared upon the stage and began to spar. At first Riordon, in the language of the ring, "forced the fighting," the defendant seemingly acting upon the defensive. After sparring 30 or 35 seconds, the defendant struck Riordon, upon the side of the jaw, face, and chin, a blow, the force of which was described by the witnesses for the people and the defendant as apparently being, in the opinion of some witnesses, a light tap, and not described by any in terms as being a blow of great severity. But, according to the witnesses for the people, upon being struck Riordon's head and body straightened up; he then made an effort to put up his arms in position to guard and strike; and then gradually sank to the floor, like a person lying down. He was then taken off the stage, and did not recover consciousness, and died five hours thereafter. The autopsy performed the following morning revealed a large blood clot under the dura mater, in the right hemisphere of the cerebrum, of four ounces in weight, and several small clots in the left hemisphere of the cerebellum; and it was claimed by the witnesses for the people that the right crus cerebri was lacerated. The defendant denied that the homicide was caused by the blow, but claimed that the conditions revealed upon the autopsy were caused by cerebral hemorrhage occasioned by the degenerated condition of the arteries in the brain, in connection with the hypertrophied condition of the heart; and also that this condition was aggravated by a diseased condition of the deceased in other respects.

Benj. J. Shore, Dist. Atty., and Jay B. Kline, Asst. Dist. Atty., for the People.

Frederick B. House, Chas. E. Ide, John McLennan, and Louis L. Waters, for defendant.

ROSS, J. (charging jury). I desire first, gentlemen, to congratulate you upon the apparent approaching close of this case. It has been one of great strain upon you, great inconvenience to you, as well as a great strain upon the eminent gentlemen who have represented the people and the defense; and we all are glad, I am sure, that you are at the apparent nearing of the determination. I also may state, gentlemen, that you are to be congratulated, and it is to be commended, upon your selection. Out of 150 names drawn from the body of the county of Onondaga, you are the gentlemen only

who have passed the ordeal of examination, and have been selected to stand, impartially and honestly, between the people of the state of New York and this defendant,—not because of your superior intelligence over that of your fellows, but because it appeared to the eminent and watchful counsel upon either side that, if your answers were truthful, you presented nearer a judicial, fair, and unbiased frame of mind, representative of the truth, and of making fair, logical deductions from the evidence which should be presented to you. You, gentlemen, in this matter are to be the sole judges of the facts, uninfluenced by any thought which you may have of any opinion which the court may entertain; but it is your sworn duty, when you have ascertained these facts, fairly deducible from the evidence, to apply such deductions fearlessly, whatever may be the result. If I, gentlemen, erroneously state to you the law, the appellate courts will speedily and certainly correct such error; but if you err,—if you make a mistake in your decision,—the people of the county of Onondaga and the defendant at this bar are practically helpless. In this matter, gentlemen, the state of New York has no revenges to perpetrate. In this matter, gentlemen, Fitzsimmons has nothing fairly to present to you extraneous to this case, excepting such presentation as is deducible from the evidence. The law has thrown around the person of a defendant charged with crime many safeguards, including, with others, the presumption of innocence,—that his guilt must be established beyond a reasonable doubt; and, when the facts are ascertained by you, if there exists such doubt,—if the evidence fails to overthrow such presumption of innocence,—you will acquit; but, if they point with certainty, subject to those rules which I have and shall lay down for your guidance, to his guilt, you will as fearlessly find that fact.

Gentlemen, I incorporate as a part of my charge a direction to you, that you may understand, at the outset in this important matter, your position, from the charge of the eminent criminal lawyer and justice, Mr. Recorder Smythe, in a recent important case. This judge uses the following language:

"Let us look for a moment and see how humane the criminal law is. At times it is very much misrepresented by people who do not understand it. This defendant, like all others occupying the position that he does, or even when charged with the commission of the lowest grade of crime known to the law, is entitled to have his guilt established to the satisfaction of a jury, of his own selection, practically, by what the jury shall esteem to be competent evidence, satisfactory to them, and which establishes his guilt beyond every reasonable doubt,—not every imaginary doubt, not every unsubstantial doubt, but beyond every reasonable doubt. Twelve men must agree before a verdict can be rendered, either against him or in his favor. He is entitled to the benefit of the presumption, which the law extends to him, and to every other man charged with crime, that he is a man of good character, and that he is innocent of the charge preferred against him. The latter presumption continues to exist from the commencement of the case down to the time that you render a verdict against him, if you should render such a verdict. That presumption must be overcome by the prosecution by such evidence as will convince your minds of his guilt beyond a reasonable doubt. * * * With so many safeguards, and there are many others surrounding this man, surely, where he has had all the advantages and benefits which the law gives him, if the evidence in the case satisfies a jury of his guilt, there should be no

hesitation on their part to say so; if it fails to satisfy them beyond a reasonable doubt, or if they entertain a reasonable doubt of his guilt, the law says they must acquit."

Now, gentlemen, this outlines, in the beginning, the position which you occupy, between the people and this prisoner. You will remember the occurrence on the night in question, as it has been related to you,—the facts that occurred in the opera house: That the deceased, Riordon, came to the opera house a little before 10; that, a few hours afterwards, he was taken from there in a dying condition, and, subsequently, in the morning, died. You have heard the description of those who were present as to what occurred upon the autopsy. Now, the claim of the people, gentlemen, in brief, is that this man Riordon's death was caused by a blow struck by the defendant,—struck while engaged in a contention, or fight, as I shall define it further on; or struck while engaged in the commission of an assault and battery, as I shall define it; or without due regard and circumspection, if you should find that the acts were lawful; that the immediate cause or the necessary cause of this homicide was the acts of the defendant; that the ultimate or ordinary or probable consequence of that act was the death of Riordon; that that act was perpetrated with such criminal intent as is necessary under the statute to complete the crime charged. The contention of the defendant is that this was an excusable homicide; that this death was an accident which happened under circumstances which I shall explain to you soon, defined as an excusable homicide; and that these men were engaged in a lawful encounter, simply a contest of power and of skill; and that this was simply one of the circumstances which is liable to follow.

Now, gentlemen, it will become your duty to determine, and it is also my duty to explain to you, as best I can, the meaning of the term "manslaughter," and define its meaning in the various degrees. To do this, gentlemen,—and you will bear with me,—is not the work of a moment. I shall have to arrive at this, to make it intelligent to you, in a measure, by the process of elimination,—by showing to you what it does not mean. The crime of manslaughter is the oldest homicide known to the law. Early in the English statutes,—a law from which our law is derived,—manslaughter was the only kind of homicide known; and it was not until the reign of Henry VIII. that distinctions were made. And the first distinction, as a matter of historical interest, was removing what was termed the benefit of clergy from those who had committed a homicide with premeditation and malice aforethought; and here was the first distinction that separates the intentional from the unintentional homicide. Now, gentlemen, in view of the source of our law, in view of the sanctity in which all the English-speaking people view human life, it was the undoubted intention of the framers of the present Penal Code, under which you are to act, to include, somewhere within its covers, a description of the punishment of every crime of homicide not excusable or justified. Now, gentlemen, what is justifiable homicide? I shall speak of this very briefly, because I understand, or I do not understand that it is seriously contended, or contended

at all, that this is a case of justifiable homicide; and I will say briefly that sections 204 and 205, defining justifiable homicide, define cases where a person is deprived of his life in resisting or fleeing from a public officer in the administration of justice; that section 205 briefly, and in a general way, defines those cases where you are acting in self-defense of your person or property, or the property or persons of your family.   Now, gentlemen, I have hastily indicated to you what justifiable homicide is.   Now, I want to call your attention more carefully to what excusable homicide is; and I want to read this slowly to you, and I intend, if I do not overlook it, to read it to you again, because it is within the five lines that I read to you that this defendant must find the antidote for the position in which he is in, if it is to be found; and, if it is contained within this section, it is as ample as if it extended from one cover of the book to the other:

"Homicide is excusable when committed by accident and misfortune in lawfully correcting a child or servant [of course that is not this case], or in doing any other lawful act, by lawful means, with ordinary caution and without any unlawful intent."   Pen. Code, § 203.

Gentlemen, I read this to you again, leaving out the matter in regard to the child:

"Homicide is excusable when committed by accident and misfortune, in doing any lawful act, by lawful means, with ordinary caution and without any unlawful intent."

If you find, gentlemen, that the defendant's acts place him within the protection of this section, acquit him.   Eliminate from this any of the elements which I have read,—in doing any lawful act, using lawful means, using ordinary caution, with a lawful intent,—eliminate any one of those elements, and that section no longer protects.

I have shown you, gentlemen, what justifiable homicide is.   I have commented upon what excusable homicide is.   I am now going to define to you—because, as I approach the definition of manslaughter, you will see the necessity of this course—what murder in the first degree is, and I read:

"Murder in the first degree is the killing of a human being, unless it is excusable or justifiable, when committed, either from a deliberate or premeditated design to effect the death of the person killed, or another."

And then follows a definition which is not important to call your attention to, except by way of explaining why I omit it.   The commission of the act, or the death of a person while engaged in the commission of, or attempted commission of, a felony or of arson, in the first degree.   The elementary principle or central idea of murder in the first degree is an intent to kill,—a premeditation.   Now, gentlemen, I define to you from this statute what murder in the second degree is:  Where there is an intent to kill, but without premeditation and deliberation.   Now, gentlemen, I have defined to you justifiable homicide, excusable homicide, murder in the first degree, which is committed with intent and with premeditation, murder in the second degree, which is committed with intent, but without pre-

meditation.   Now I am in position to define to you what manslaughter is:

"Manslaughter, in a case other than one of those specified in sections one hundred and eighty-three, one hundred and eighty-four and one hundred and eighty-five [those are the sections in defining murder in the first degree and second degree, and the killing of a person while engaged in a duel], in a case other than the one specified in those sections, homicide not justifiable or excusable, is manslaughter."   Pen. Code, § 188.

So, as I say, going back to the origin of things, gentlemen, it was the intention of the framers of this Code to provide a definition and a punishment for every kind of homicide not excusable or justifiable; and every kind of homicide not excusable or justifiable which is not murder in the first or second degree, or a death ensuing while engaged in a duel, is manslaughter.

Now, gentlemen, I will define to you at this time what manslaughter in the first degree is:

"Such homicide is manslaughter in the first degree, when committed without a design to effect death [the moment that you incorporate into the person's intention to effect death, the crime no longer is manslaughter, but is murder in one of its degrees]: First, by a person engaged in committing or attempting to commit a misdemeanor, affecting the person or property, either of the person killed or of another.   Second, in the heat of passion, but in a cruel or unusual manner, or by means of a dangerous weapon."   Pen. Code, § 189.

The last clause contemplates a case where the prisoner or the defendant acts in the heat of passion, in a cruel or unusual manner, or with a dangerous weapon.   I think that one of the requests of the defendant in this case is to charge the evidence does not show the commission of manslaughter in the head of passion, or homicide in the heat of passion, or in a cruel and unusual manner by means of a dangerous weapon; and I so charge.

Now, gentlemen, in ascertaining whether this defendant was guilty of the crime of manslaughter in the first degree, you must first satisfy yourselves, beyond a reasonable doubt, of the fact that the homicide—that the death of Riordon—was caused by the act of the defendant.   If you find that as an ultimate and probable consequence, giving the defendant the benefit of every reasonable doubt and the presumption of innocence, then the question which presents itself to you sharply is whether, at the time of the act which caused this homicide, Fitzsimmons was engaged in the commission, or attempted commission, of a misdemeanor; for, if he was, it is your duty to find him guilty.   Now, gentlemen, this depends upon the answer which you give to two inquiries: First, was Fitzsimmons at this time engaged in a contention, or fight, within the meaning of the statute?   If he was, and if his acts caused this death, your verdict will be guilty.   If you find that such is not the fact, then you will approach the question of whether he was engaged in the commission of an assault and battery.   Now, gentlemen, with reference to this matter of whether he was engaged in a contention or prize fight, section 458 of the Penal Code reads as follows:

"A person who, within this state, engages in, instigates, aids, encourages, or does any act to further a contention or fight, without weapons, between

two or more persons, or a fight commonly called a ring or prize fight, either within or without the state [and then follows in regard to sending a challenge], is guilty of a misdemeanor."

I repeat to you the latter part of the section:

"Or does any act to further a contention or fight, without weapons, between two or more persons, or a fight commonly called a ring or prize fight."

This statute is peculiar, and has received very little, if any, judicial construction, as I understand it. And, in considering this statute, gentlemen, and applying it to the facts, you are not to be governed by any phraseology of the prize ring, as we understand it by rumor; but you are to be governed by the same rules and the same application of rules or interpretation of rules that you would use in any minor transaction, bearing in mind the purpose of the statute itself. We know, by reputation, at least, although it is not in evidence, what ordinarily, in the minds of the public, constitutes a prize fight. It is for you to say whether, in using the words which I have read,—"a contention or fight without weapons between two or more persons, or a fight commonly called a ring or prize fight,"—it was the reasonable intention of the framers of this act to provide against the occurrence of something beyond and something else besides what is indicated in the last clause that I have read to you, or whether the first is merely explanatory of the latter. Bearing in mind, as I charge you, gentlemen, that, growing out of the early law in this matter, one of the things which was considered unlawful in a fight or contention—one of its elementary principles, if I may so characterize its evils—was the gathering together of people, and the tendency to create a disturbance and a breach of the peace.

Now, gentlemen, with these suggestions, it is for you to say, fairly, within the evidence, what occurred there. The fact that these men wore gloves or the fact that they didn't wear gloves, the fact that they called it this or that, does not govern you; but the honest, plain English of that statute, and your sworn duty and your reason, as men of affairs.

Now, this is the contention of the defendant in this regard: that this was simply a trial of athletic skill, lawful in itself, and ordinarily not tending to harm. It is fairly to be inferred from their contention (what is a matter of common knowledge) that in any athletic contest, exhibiting powers of skill, there is necessarily involved an element of danger. Now, gentlemen, if you should find that this was not a contention or fight, within the meaning of the statute, you are next to consider, assuming, as I have suggested before, that you find that the homicide was caused by the act of the defendant, whether the defendant was engaged in the commission, or attempted commission, of a battery upon the person of Riordon. An assault in the third degree is a sort of general description of other assaults not included in what I called assaults in the first and second degrees; which, in brief, defines those serious assaults which threaten or attempt the taking of human life, but unsuccessfully, or which attempt doing to the person assaulted grievous bodily harm. It is what is known in ordinary parlance as an assault and battery.

Now, gentlemen, if you find this homicide is traceable directly and fairly to the act of the defendant, and you find at that time, within the definition which I have laid down to you, that he was engaged in the commission of an injury, or an assault in the third degree, it will be your duty to find him guilty. Now, gentlemen, this depends largely upon the fact of the element of consent. It may be assumed at this point that Riordon and Fitzsimmons mutually agreed to engage with each other in these contests. Now, gentlemen, consent is sometimes an excuse for crime; at other times it is not. It is an excuse for larceny, unless your property is obtained by trick; and then it is a serious question whether you consent. In other words, a prisoner cannot be convicted of larceny if you consent that he should take your property. It is a necessary element in the crime of rape, unless perpetrated upon the person of one so young that she cannot, in the eyes of the law, consent; because the moment that you have the consent of the female it ceases to be rape. But there are other crimes to which the parties cannot consent to their commission; and, in considering this question, gentlemen, as applied to this case, you are to consider—First, whether, in fact, Riordon did consent to receive such a blow, if one was given; and, second, whether he had the legal right to so consent if, in fact, he did. Did Riordon consent to receive whatever was in store for him in this game, if it was a game? Did he take his chances, whatever might be the consequences, or did he only consent to such treatment, to such consequences, to such acts, on the part of the defendant, as would ordinarily be the result of that contention or game? Was it the intention of Fitzsimmons, at the time this blow was struck, if you should find that it was struck, to strike upon the person of Riordon a disabling blow, one intended for the purpose of doing him injury beyond what he reasonably expected or consented to when engaged in the contest? Now, gentlemen, assuming that you should find this fact with the defendant, did Riordon have the right to consent to have his life taken, or to have this injury or receive this blow? The public is a party to all these transactions, and it has an interest which the parties to the transaction cannot eliminate. And I read to you, gentlemen, briefly, from an article on this subject of consent:

"In some cases of criminal injury to individuals, a lack of consent of the individual is not always a necessary element of the crime. Homicide, mayhem, and battery may be committed, though the individual injured consented to the injury. The reason for this is clear. The public has an interest in the personal safety of its citizens, and is injured where the safety of any individual is threatened, whether by himself or another. * * * A game which involves a physical struggle may be a commendable and manly sport, or it may be an illegal contest. * * * This depends upon whether it is a game which endangers life. Thus, in the prosecution for a death which was caused accidentally in playing the game of football, it was left to the jury to say whether the game was dangerous; for, if so, consent on the part of the players to submit to what the game had in store for them would not protect a player from prosecution."

In other words, gentlemen, nine men, or whatever constitutes a team of football, cannot lawfully engage in a contention upon the green with the idea that the result may terminate in the death or

serious injury of one-half of them; but, if the rules of the game and the practices of the game are reasonable, are consented to by all engaged, are not likely to induce serious injury, or to end life, if then, as a result of the game, an accident happens, it is excusable homicide.

"No rules or practice of any game whatever can make that lawful which is unlawful by the law of the land, and the law of the land says you shall not do that which is likely to cause the death of another."

Now, gentlemen, I have defined to you what constitutes manslaughter in the first degree. There must, first, be the fact of homicide; there must, second, be the fact that you find that the defendant was at that time engaged in the commission either of this contention or of an assault and battery.

Now, gentlemen, before you can convict the defendant of the crime of manslaughter, there is another element almost always presented, and an important element, to which I shall now call your attention; and that is the element of intent. It is not necessary, gentlemen, that the defendant intended to violate the law. The law presumes that every person knows its provisions. It is certainly not necessary that the defendant should have anticipated the consequences of his acts, if he committed them; but you must find an intent to do the unlawful thing in question,—the specific act,—to fight, contrary to the statute, to commit a battery on Riordon; that is, that there was intent not to violate section 488, section 458, or whatever the number was; not an intent to commit an assault and battery with the idea that he knew that he was committing it; but an intent to do the act which constituted a violation of those provisions. Now, gentlemen, this fact of intent is proved like any other fact in the case. You may infer this fact from other facts in the case; and the defendant is presumed, as has been suggested during the trial, to intend the ordinary and probable consequences of his acts. Upon this subject I shall read to you, gentlemen, and incorporate as a part of my direction to you, from the opinion of the late Mr. Justice Ruger, in the case of People v. Conroy:

"Wherever intent is made an element in determining the character of an act, it is in accordance with our general observation and experience to infer its existence by reference to the laws which have been usually and generally found to control human conduct. Indeed, this is the only method by which the intent can be made to appear. The intent is the secret and silent portion of the mind, and its only visible physical manifestation is in the accomplishment of the thing determined upon. The individual whose intent is sought to be ascertained may remain silent, or, if he speaks, may, and probably will, if he has a crime to conceal, speak untruly; and thus the mind is compelled, from necessity, to revert to the actual physical manifestations of the intent, exhibited by the result produced, as the safest, if not the only, proof of the fact to be ascertained." 97 N. Y. 77.

As has been stated elsewhere, men who contemplate, or who have perpetrated a crime, do not proclaim, as a rule, their guilt, or their criminal intent. Now, I desire, gentlemen, before I leave this, to again call your attention that you are to find this question of intent, if it is to be found, like any other fact, fairly inferable from the other facts in the case, and from all the evidence; and it is an in-

tent, not directly, gentlemen, that Fitzsimmons supposed he was going to kill Riordon (for, as I have suggested, the moment you find that, it is elevated into a more heinous crime), not that he intended specifically to violate this section or that section in regard to the assault and battery, but did he intend to do the act which you find, if you do find, constituted a violation of those sections. I call your attention in this connection, as it seems to me in place at this point, to two or three lines from the opinion of the court in the case of People v. Wiman, in which the following language is used:

"It is undoubtedly true that, in order to constitute a crime. the doing of the act prohibited, with the intent to do the act, is sufficient, although the party may not be aware of the fact that he is transgressing the law." (Sup.) 32 N. Y. Supp. 1045.

Now, gentlemen, if it appears that a crime has been committed, and you should not be satisfied by that preponderance of evidence satisfactory to your minds that the defendant is guilty of manslaughter in the first degree, under the definition which I have given you, but you should find that the facts constitute all the elements of an assault in the second degree, or manslaughter in the second degree, as I shall define them, you have the right, under the provisions of the Code, to find him guilty of manslaughter in the second degree; but you are not to find a lower degree, unless it contains in itself—unless the evidence contains in itself—all the elements necessary to constitute that crime, the same as if he were placed upon trial for that crime, without reference to the one with which he is charged.

Now, gentlemen, manslaughter in the second degree is defined as follows:

"Such homicide is manslaughter in the second degree, when committed without a design to effect death, by a person committing or attempting to commit a trespass or other invasion of a private right, either of the person killed or of another, not amounting to a crime; or, second, in the heat of passion, but not by a dangerous weapon, or by the use of means either cruel or unusual." Pen. Code, § 193.

—Dropping from the cruel means suggested in the former section in relation to manslaughter in the first degree, and the use of a dangerous weapon, to simply a case of death in the heat of passion. And I am asked, in the ninth request to charge, by the defendant, that the evidence does not show a crime, within the meaning of those two sections; and I so charge you.

The third subdivision, relating to and defining manslaughter in the second degree, reads as follows, and to which I call your attention:

"Such homicide is manslaughter in the second degree [I read from the beginning of the section], when committed," etc., "by any act, procurement, or culpable negligence of any person which according to the provisions of this chapter does not constitute the crime of murder in the first or second degree, nor manslaughter in the first degree."

In other words, gentlemen, this seems to be a sort of blanket provision, covering those cases of homicide not excusable or justifiable, and not defined in any of the sections relating to murder or

to manslaughter in the first degree, or previously provided for in the section in relation to manslaughter in the second degree; and it covers, as I charge you, the involuntary manslaughter of the common law, which contemplates a death without malice, without intent, committed by a person engaged in a lawful act, by his carelessness, by lack of due caution and circumspection. Now, the ordinary instances of cases of this kind are: cases of reckless driving, of throwing rubbish from roofs, and the accidental discharge of loaded firearms, where there was not any unlawful intent, in the sense that a person intended to commit a misdemeanor,—simply intended to commit the act itself which was perpetrated or committed. Now, gentlemen, if you should arrive, under the definitions which I have given you, at a consideration of whether the acts constitute a crime under this subdivision, you have not necessarily (and I place it squarely upon the record so that the defendant can have the benefit of it) to find a criminal intent, in the sense that you must find an unlawful intent to commit a misdemeanor, in the previous section. A person intends the natural and ordinary consequences of his acts; and, in the commission of an act of gross carelessness, or acting in a lawful pursuit without due circumspection, you have only to find the intent to perpetrate that act, and the lack of care in its consummation; and the degree of care which you must find the defendant should exercise is one commensurate with the occasion and the danger. In other words, what would be due care in your driving your horse rapidly in the town of Clay, where no person was in sight, might, if you ran over a child or a woman, be found by a jury to be gross carelessness in the city of Syracuse. You are to consider, in determining this question, the position of the parties, their physical strength, their skill or lack of skill, the effect which one of these blows (if you find that it was a blow which caused this trouble)— the effect which could be accomplished by the use of a skillful blow; and to find, from the circumstances in this case, to what extent the defendant knew his own strength, and his power to accomplish a result which he desired. Not (again cautioning you for a moment, gentlemen) that he was intending to kill Riordon; but, knowing his own skill, under all the surrounding circumstances of that occasion, did he intend to give this deceased a blow which would injure him seriously for the time being, or did he strike him with such a disregard of human life and safety, without due circumspection and caution, taking into consideration that this is an athletic performance? If you should so find, you can find him guilty of manslaughter in the second degree.

Now, gentlemen, to summarize, did the act of Fitzsimmons cause the death of Riordon? Was this death caused while Fitzsimmons was engaged in the commission of a fight, prohibited by the statute? Was it committed while he was engaged in the commission of an assault in the third degree? To find that you must find an unlawful intent (not an intent which necessarily supposes the results,— which necessarily supposes that Fitzsimmons knew what would be the result,—nor that he knew that he was violating the law), but

did he intend to do the act which you find, if you do find, was a
violation of the law?    If you should find in favor of the defendant
(and, in passing, I would say you are to consider the nature of this
contest of physical skill; you are to consider the question of Rior-
don's consent; you are to consider whether, in fact, he did consent.
If he did consent to take whatever was in store, had he the right,
under the definitions which I have given you, to so consent?)—if
you find for the defendant under those definitions, you may then,
as I have suggested, consider whether this game (if you find it was
lawful, or Riordon's consent excused this battery, or this was not
a contention or fight, within the meaning of the statute)—then you
are to consider:   Was this act done with due caution and circumspec-
tion; due care, considering all the probable consequences?

Now, gentlemen, I am very nearly through.   There is one matter
of importance to which I desire to call your attention, and, as I
stated to you at the beginning, I am going to again, at the expense
of losing the connection of my remarks, define to you excusable
homicide:

"Homicide is excusable when committed by accident or misfortune, in do-
ing any lawful act, by lawful means, with ordinary caution and without un-
lawful intent."

The act must be lawful; the means must be lawful; the caution
must be ordinary; and the intent must be lawful.

Now, gentlemen, at this connection, I desire to call your attention
to what has been suggested before you several times, and that is this
question of reasonable doubt.   It is doubtful whether any better
definition can be given of this than the words themselves as suggest-
ed in the charge of Mr. Recorder Smythe.   It does not mean an im-
aginary, speculative doubt, it means a reasonable doubt, upon which
you would act in the ordinary transaction of human affairs.   But,
gentlemen, whatever doubt you have must grow out of the evidence
which has been placed before you,—either in the evidence produced
affirmatively to your senses, or by the absence or lack of evidence to
satisfy your minds as to the guilt of the prisoner.   Now, gentlemen,
a good many experts have been sworn in this case; and I desire to
speak briefly upon that class of evidence.   In some cases which are
presented, this evidence demands the highest respect possible for us
to give to scientific thought and careful investigation and research
and training.   This is particularly true in those cases in detecting
poisons.   When witnesses testify from their observation as to facts
which they themselves saw, you have to give their evidence such
weight and such credence as you believe it is entitled to from the
apparent intelligence, or lack of intelligence, of the witness; ap-
parent interest, or lack of interest; bias, or lack of bias.   But, when
you consider the evidence of experts, you may take into considera-
tion the extract which I read from the opinion of Mr. Justice Peck-
ham, and give it such weight as to you seems proper, where he
says:

"Expert evidence, so called, or, in other words, evidence of the mere opin-
ion of witnesses, has been used to such an extent that evidence given by them
has come to be looked upon with great suspicion, both by courts and juries;

and the fact has become very plain that, in any case where opinion evidence is admissible, the particular kind of evidence desired by any party to the investigation can be procured by paying the market price therefor. We have said, also, that the rules granting the opinions of experts should not be unnecessarily extended." Roberts v. Railroad Co., 128 N. Y. 455, 464, 465, 28 N. E. 486.

Where these gentlemen speak upon a matter purely scientific, a matter not open to common observation, they are entitled to great weight; and you, in any event, can give such weight as you believe they are entitled to, under all the circumstances of the case. But you can also consider the comments of the justice, the judge of the court of appeals, that a man, a lawyer, in prosecuting or defending a case, can purchase as many expert witnesses as his client has the cash to pay.

Now, gentlemen, with these remarks I have endeavored to, as fairly as I could, perform my duty, unaided by that best and rarest teacher, experience. I believe that the district attorney has honestly, faithfully, and fairly tried to do his duty. It certainly is evident to every one of your number that, surrounded as the defendant has been by that brilliant array of counsel who have looked after his interest, he has been carefully protected.

Now, gentlemen, the responsibility has shifted from those gentlemen, and from myself, to you; and, in your deliberations, I trust you will only be governed by your oaths and by the same motives which have governed me in the performance of my duties, and that is to perform my duty as best I can to the people of the county of Onondaga, and to the prisoner at the bar.

Now, gentlemen, the defendant has submitted several requests to me to charge. The first and second requests I refuse. The third is refused, except as heretofore charged. The fourth request, that the accidental killing of the deceased does not constitute the crime of manslaughter, I charge, with the modification which I have heretofore given. The fifth request I refuse, except as heretofore charged. The same with the sixth. The seventh, I am asked to speak as to certain proof in the case, which I refuse to charge. I leave the facts with the jury. The eighth request I refuse, excepting the last portion of the request, that the killing was in the heat of passion, and in a cruel and unusual manner, or by means of a dangerous weapon. That it was not, I so charge. The ninth request I have already charged, excepting the last part of the request, "by any act, procurement, or otherwise," which includes the third subdivision of the definition of manslaughter in the second degree. That I refuse to charge. The tenth I refuse. The eleventh I refuse. The twelfth I refuse, except as heretofore charged. The thirteenth, that, if this homicide was committed by the defendant by accident or misfortune, the defendant is not guilty of any crime. I charge that, with the addition: if you believe it was within the definition given you of excusable homicide. The fourteenth request that if, after considering the evidence, there remains in the minds of the jury a reasonable doubt as to whether the death of Riordon was caused by a blow from the defendant, or as to whether it was caused by excitement and exertion of the deceased, and his habits of life, the jury must

give the defendant the benefit of that doubt, and the defendant must be acquitted. I so charge. The fifteenth request I refuse, except as heretofore charged.