STATE v. POWELL.

(Filed April 3, 1906).

*Intoxicating Liquors — Sufficiency of Indictment — Illegal Sale—Knowledge of Intoxicating Quality—Mistake of Fact—Presumption.*

1.  In a bill of indictment for retailing intoxicating liquor, the words "wilfully and unlawfully," or words of equivalent import, should be used though such language is not found in the statute.

2.  In an indictment for retailing intoxicating liquor, evidence of the defendant that the article purchased by him was known as "phosphate" and came within the category known as a "soft drink," and that he had a guaranty from the manufacturer that it was non-alcoholic and non-intoxicating, that the agent of the manufacturer furnished him with what purported to be a statement from the Commissioner of Internal Revenue that it was not taxable, that he purchased it in good faith and in the full belief that it contained no alcohol, that he received it on the 5th day of the month, sold only one day, hearing it was charged to be intoxicating he immediately closed it and shipped it to the manufacturer, was competent to show that the defendant did not knowingly sell intoxicating liquor, that in doing so he was acting under a mistake of fact.

3.  A mistake of fact neither induced nor accompanied by any fault or omission of duty, excuses the otherwise criminal act which it prompts.

4.  When the statute does not make knowledge or intent an essential element, the State may, upon proof of the commission of the act, rest and rely upon the presumption that knowledge is in accord with the fact. The duty then devolves upon the defendant to show the exculpatory facts.

INDICTMENT against Sylvester Powell for retailing intoxicating and spirituous liquor contrary to the statute, heard by *Judge M. H. Justice* and a jury, at the February Term, 1906, of the Superior Court of ROBESON.

The State introduced Jim Ezzell, who testified that on

Tuesday, February 6, 1906, at the store of the defendant, in Lumberton, he purchased at two or three times a certain drink called "Phosphate," or something of the kind; that it would take about a quart of this drink to intoxicate; that he paid twenty-five cents a quart for the liquid so purchased by him. On cross-examinaion he further testifies that he returned to defendant's Wednesday morning and offered to purchase more, but defendant declined to sell him any, telling him that he had understood that it was alleged that the "Phosphate" drink was intoxicating, and if so, he would sell no more of it, but would return it immediately to the maker, and he asked defendant two or three times on Wednesday morning to let him have more, but he refused. There was no evidence that defendant had ever sold any of this liquid except on the Tuesday named.

The State rested its case, and the defendant offered himself and other witnesses to show that the drink so called by him was purchased as a "soft drink" under a guaranty from the manufacture that it was non-alcoholic and non-intoxicating, and that at the time of the purchase the agent of the manufacturer furnished him with what purported to be a statement from the Commissioner of Internal Revenue, that it was non-taxable; that he purchased it in the full belief that it contained no alcohol; sold it so believing; that he received from the manufacturer the only purchase made by him on Monday, February 5th; only sales made by him were on Tuesday, February 6th, and having heard Tuesday night that it was charged that this "Phosphate," the name being given to it by the manufacturer, Burmanco, was intoxicating, he immediately closed it up and shipped it back to the manufacturer, having had it in his possession only one day, and refusing to make any sales after he was informed of the charge that it was intoxicating.

His Honor declined to admit this evidence, and the defendant excepted. Under the charge of His Honor the jury re-

turned a verdict of guilty. From a judgment upon the verdict, the defendant appealed.

*Robert D. Gilmer, Attorney-General,* for the State.
*McLean, McLean & McCormick* for the defendant.

CONNOR, J., after stating the case: It will be observed that the bill of indictment charges the sale of the intoxicating liquor to have been made "wilfully and unlawfully." This language is not to be found in the statute, but this court has several times held that these words, or words of equivalent import, should be used in indictments for violating statutes prohibiting, or making criminal the doing or omitting to do the acts described. In *State v. Simpson,* 73 N. C., 269, the indictment was drawn under a statute declaring it a misdemeanor to kill or abuse live stock in any enclosure not surrounded by a lawful fence. Neither the words "with intent" or "wilfully, or unlawfully," nor any words qualifying or giving character to the mental attitude of the party are to be found in the statute. Because the words "unlawfully and wilfully" were not in the indictment, judgment was arrested. *Pearson, C. J.,* said: "The statute by its necessary construction must be qualified by the addition of the words 'wilfully and unlawfully.' Common sense forbids the idea that it was the intention of the General Assembly to send to jail every person who by accident kills or injures stock in an enclosure not surrounded by a lawful fence." In *State v. Parker,* 81 N. C., 548, it was held that an indictment under the same statute, charging the act to have been "unlawfully" done was defective and judgment was arrested because of the failure to charge that it was "wilfully" done. These rulings do not conflict with those which hold that when a person intentionally does the act forbidden by the statute, the criminal intent attaches to the act, as in *State v. King,* 86 N. C., 603, and many other cases in our reports.

The distinction is said to be—if the criminal character of the act is made to depend upon the *intent* as in disposing of mortgaged property with intent to defraud the mortgagee, the intent must be charged and proven, whereas, if the *act* is made criminal the intent need not be proven or charged, as in indictments for removing crops, but as we have seen, it must be charged that the act was wilfully—that is, intentionally, done—the criminality attaching. See discussion of *Smith, C. J.,* in *King's case, supra.* The proposed testimony was not offered to show that the defendant knowingly sold intoxicating liquor, but had no criminal intent; for such purpose it was clearly incompetent. The purpose of the testimony was to show that he did not knowingly sell intoxicating liquor; that in doing so he was acting under a mistake of fact. The principle is well illustrated in *State v. Nash,* 88 N. C., 618, in which the defendant hearing unusual noises at night near his dwelling, ringing of bells, blowing of horns, discharge of pistols and guns, etc., his child, who was sleeping near a window in the house through which the noise was heard and the flashes of the discharge of the guns seen, ran to defendant with blood on her face, whereupon he took his gun, went to the door and fired into the crowd, wounding several. It turned out that the crowd consisted of boys who were, in that peculiar manner, serenading defendant. *Ashe, J.,* said: "Did the defendant have reasonable ground to believe that his daughter had been shot and the assault upon him and his house was continuing? If he had, then he ought to have been acquitted." The decision is based upon the ruling in *Selfridge's case.* It is said that the defendant did the act prohibited by the statute—sold an article containing intoxicating liquor—and that it is immaterial with what intent he did it. So Nash did an act prohibited by law—he fired a pistol into a crowd who were engaged in harmless amusement. Selfridge fired upon and killed a man approaching him with an empty pistol pointed

at him.   In both cases the defense was sustained upon the well-settled principle that they acted under a mistake of fact. In neither case were the defendants in any danger from the conduct of the persons assaulted, but the jury were instructed to acquit if in their opinion they acted under a reasonable apprehension and belief that the fact was as they supposed. The principle is essential in the administration of the criminal law.   Without it the law would become an engine of wrong and oppression.   In almost every case involving the plea of self-defense it is announced from the bench and applied by juries.   Mr. Bishop states the law so clearly and so strongly vindicates the principle that we prefer to adopt his language.   "Of course, to make such defense available, the defendant must have acted in good faith and with due care and caution.   And when this good faith and this due care do exist, and there is no fault or carelessness of any kind, and what is done is such as would be proper and just were the fact what it is thus honestly believed to be, there is no principle known to our criminal jurisprudence by which this morally innocent person can be condemned because of the existence of a fact which he did not know and could not ascertain.   On the other hand, to condemn him would be to violate those principles which constitute the very foundation of our criminal jurisprudence.   Honest error of fact is as universal an excuse for what would otherwise be a criminal act as insanity.   And it is a universal rule in the interpretation of criminal statutes that when an expression is general in terms, it must be taken with such limitations and exceptions as the principles of the unwritten law have established; to justify a different interpretation the statute must be specific and name the particular thing in respect of which there is to be a departure from this fundamental rule.   Thus a statute forbidding or making penal a thing in general terms does not justify the punishing an insane person who commits the act or a child under seven years of age or a sane

person of full years who does the forbidden thing under a compulsion which he cannot resist; or, as we have just seen, who does it from a pure mind under a mistake of facts which he cannot overcome. These exceptions are grafted upon the statute by the common law; and, if the courts did not recognize this effect of the common law to modify the general terms, courts and statutes would alike be abated—and they ought to be as public nuisances, by the uprising of the popular instinct." We find no direct authority in our reports. The cases relied upon to sustain His Honor's ruling arose out of efforts to avoid criminal liability either by claiming that there was no intent to violate the law, as in indictments for carrying concealed weapons (State v. McManus, 89 N. C., 555), removing crop (State v. Williams, 106 N. C., 646), or by showing that the defendant did not know that the act was prohibited by statute. State v. Downs, 116 N. C., 1064. In none of these cases is the question here presented involved or decided. We have examined, with care, the cases cited by the Attorney-General who, with his usual industry, has gathered all of the cases decided by this court bearing upon the subject. In McBrayer's case, 98 N. C., 619, Merrimon, J., says: "That the defendant in good faith thought that he had the right to sell the minor the spirituous liquor, did not excuse him from criminal liability," showing clearly the principle upon which the decision went. He concludes the discussion with the maxim, "ignorantia legis neminem excusat." In State v. Scoggins, 107 N. C., 959, and State v. Kittelle, 110 N. C., 560, the question is not raised. Counsel for defendant cite a decision made by the Supreme Court of Ohio, which is directly in point, Farrell v. State, 32 Ohio St., 456. Defendant was indicted for sale of intoxicating liquors. He set up as a defense that if the bitters sold contained such liquors he was wholly ignorant thereof, that he bought them upon information and in the belief that the bitters were free from alcoholic properties.

*Ashburn, J.,* said: "Testimony tending to prove the accused was ignorant of that fact or condition which constitutes the criminal element of the criminal charge is competent. In such case the maxim of the criminal law, *'ignorantia facti excusat'* applies to his case. Ignorance or mistake in fact, guarded by an honest purpose will afford, at common law, a sufficient excuse for a supposed criminal act." Blackstone thus states the principle: "Ignorance or mistake is another defect of the will, when a man intending to do a lawful act does that which is unlawful. For, when the will and the deed act separately, there is not that conjunction between them which is necessary to form a criminal act. But it must be an ignorance of fact and not an error in point of law." 4 Com., 25. The distinction between right and liability growing out of mistake of law and of fact is recognized both in civil and criminal jurisprudence. In point of natural justice there is no very sound distinction, but of necessity and to prevent confusion and anarchy the maxim, *"ignorantia legis neminem excusat"* is adopted. To omit the word *"legis"* and insert *"facti"* would be shocking to our sense of justice and right. It would destroy one of the most essential elements of the first law of nature and make a felon of every man who, under an honest, well-grounded mistake of fact, took human life. As said by Mr. Bishop, "It would be more just to send to prison or impoverish by a fine a person admitted to be insane, because an insane person could not so keenly feel the wrong or be so indignant at the injustice inflicted, or do so much damage to the State if his instincts should impel him to appeal to the moral sentiment of mankind. And to deal thus with an insane person would be no wider departure from the established principles of the criminal law than it is to deal thus with a sane man or woman whose honest act is prompted by a mistake of facts of a sort not to be guarded against. Indeed the violence done to the law is precisely the same in one instance as in the other."

STATE v. POWELL.

"According to all of our books, mistake of fact is quite different in its consequences, both civil and criminal, from ignorance of law. There is no necessity, or technical rule of any sort, requiring it to be dealt with in any other way than is demanded by pure and abstract justice.   *   *   * To punish a man who has acted from a pure mind, in accordance with the best lights he possessed, because misled, while he was cautious, he honestly supposed the facts to be the reverse of what they were, would restrain neither him nor any other man from doing a wrong in the future, it would inflict on him a grievous injustice, would shock the moral sense of the community, would harden men's hearts and promote vice instead of virtue." Bishop Crim. Law, 302. The proposition is thus stated, "A mistake of fact neither induced nor accompanied by any fault or omission of duty excuses the otherwise criminal act which it prompts." Baron Parke says, "The guilt of the accused must depend on the circumstances as they appear to him." *Turpin's case,* 77 N. C., 473. For an interesting and enlightening discussion of this subject, see 1 Bish. Crim. Law, 330, note 4.

In *Myers v. State,* 1 Conn., 502, the defendant was indicted for a violation of a Sunday Law, *Gould, J.,* said: "Now that the defendant would not have been within the spirit or reason of the statute, upon the supposition that he actually believed a case of necessity or charity to exist, from that fundamental principle, as well of criminal law as of natural justice, that to render any act criminal the intention with which it is done must be so; or, in other words, the will must concur with the act. (4 Black., 20-4). Upon this principle it is, that idiots, lunatics and infants under a certain age are, in judgment of law, incapable of any offense whatever. Hence also, ignorance or mistake in point of fact (for ignorance of law, I admit, cannot be averred) is, in all cases of supposed offense, a sufficient excuse."

In *Com. v. Presby,* 14 Gray, 65, it appeared that a statute

made it the duty of a police officer to arrest any person found in the highway in an intoxicated condition. The defendant, having made such an arrest, was indicted for an assault. To the suggestion that, in fact, the prosecutor was not intoxicated, the officer alleged that he honestly, and upon a well-grounded belief, thought that he was in such condition. The court, by *Hoar, J.,* said: "It is argued on behalf of the commonwealth, that if Harford was not intoxicated, this statute affords no jurisdiction for his arrest, because the fact, and not a suspicion on belief, however reasonable of intoxication, is requisite to such justification." After a review of the standard authorities on criminal law, the court held that if the defendant "acted in good faith and upon reasonable and probable cause of belief, without rashness or negligence, he is not to be regarded as a criminal because he is found to be mistaken." The recognition of the principle *"ignorantia facti"* is essential to the safety of all peace officers who are required to make arrests for offenses committed in their presence. As said in *Neal v. Joyner,* 89 N. C., 287: "A peace officer may now justify his arrest, without proof of the actual commission of the crime, when he shows satisfactory reasons for his belief of the fact and the guilt of the suspected party. * * * Although the arrested party may prove to be innocent, they (the officers) can defend against actions for false imprisonment, when the arrest is shown to have been made upon information reasonably sufficient to warrant the belief that crime has been committed, and that it was committed by the person arrested." *State v. McNinch,* 90 N. C., 695. It would seem, if not seriously controverted, that a principle so consonant with elementary principles of natural justice and right, would require for its vindication neither argument nor authority. Some confusion has arisen because of a failure to note the distinction between intentionally doing the prohibited act and doing an act entirely lawful, but for the existence of some element, condition or fact unknown to the

person which brings the act within the description of the offense. We have recently held that when a person hunting supposed that a noise nearby was made by a wild turkey, acting in good faith and free from negligence shot and killed a man, was not guilty of any crime. *State v. Horton,* 139 N. C., 588.

We have so far discussed the question upon the theory that the proposed testimony would, if believed by the jury, justify the conclusion that the defendant was in fact ignorant of the presence of intoxcating liquor in the "Phosphate" which he sold and that he was not negligent in that respect. It may be that His Honor excluded the evidence because of the opinion that if true, it did not show that defendant was free from negligence. It is clear that when the statute does not make knowledge or intent an essential element, the State may, upon proof of the commission of the act, rest and rely upon the presumption that knowledge is in accord with the fact. The duty then devolves upon the defendant to show the exculpatory facts. It would seem that if the testimony offered by defendant was found by the jury to be true, the conclusion that his conduct measured up to the standard of the ideal prudent man, would reasonably follow. He proposed to show that the article purchased by him was known as "Phosphate" and came within the category known as a 'soft drink;' that he had a guaranty from the manufacturer that it was non-alcoholic and non-intoxicating, that the agent of the manufacturer furnished him with what purported to be a statement from the Commissioner of Internal Revenue that it was not taxable, that he purchased it in good faith and in the full belief that it contained no alcohol; that he received it on the 5th day of the month, sold only one day, hearing that it was charged to be intoxicating, he immediately closed it and shipped it to the manufacturer. It was in his possession only one day and he refused to make any sales after hearing that it was charged to be intoxicating.

What more could he have done? It may be suggested that he should have analyzed the phosphate. We take notice of the fact that to do this required not only learning and skill in chemistry, but instruments and appliances not in common use. It is doubtful whether such an analysis could be made in the town or county in which defendant resided. In *Byars v. City,* 77 Ill., 467, the principle involved in this appeal is in no wise questioned. The testimony was admitted. The difficulty was that as said by the court, "He was the manufacturer and was bound to know what it contained." The case does not weaken the authority of the one from Ohio. The common law is "the perfection of human reason"—to be applied in a reasonable way, to reasonable conditions, resulting in reasonable conclusions. The standard of duty in respect to obedience is that of a sane, honest, intelligent, prudent man presumed to know the law. When the conduct of the citizen measures up to this standard there can be no sound public policy, no matter how desirable the end to be accomplished, which will make him a criminal. It was said on the argument that to permit the defense of *"ignorantia facti"* to prevail would "open the door" to violations of the many wise and beneficent statutes designed to suppress the liquor traffic. It behooves the courts to give to statutes such a reasonable construction as will advance the remedy and suppress the evil, but they may not do violence to those well established principles of the common law, builded upon the wisdom of the ages, the custom of the people and the experience of centuries. To them, in times of strife and struggle with passion and power, the people must, as they have ever done, look for safety and security. The same objection was made to the construction of the statute in *Myers v. State, supra.* To it *Gould, J.,* wisely said. "The objection that this construction will facilitate evasions of the statute is not, I think, very well founded, even in point of fact. The danger of collusion will always be known to the triers; and the

probability of it, in any supposable instance, will be open to discussion. But, at any rate, considerations of this kind ought never to influence a court when, as in the present case, a construction, dictated by them, would manifestly contravene the spirit of the law as well as the universal immutable principles of justice."

The testimony should have been received and, under proper instructions, submitted to the consideration of the jury. For the error in that respect, the defendant is entitled to a

New Trial.