## STATE OF IOWA v. FRANK JACKSON, Appellant.

103 702
112 415
103 702
125 214

103 702
129 517
129 708

103 702
143 230

**Manslaughter: EVIDENCE.** It appeared that after defendant and W had an altercation with deceased, and the latter became separated from them, they went into the street to meet him. There was evidence, though it was contradicted, that W urged that he and defendant get out of deceased's way; that defendant opposed that course; and that, when they met deceased in the street, deceased was knocked down and stunned by defendant, and was pounded on the head by W, without any effort by defendant to interfere. Death was caused by the blow struck by W. *Held*, that the evidence supported a verdict of manslaughter.

**Included Offenses: INSTRUCTIONS.** Where an indictment charges murder in the first degree, and there is evidence showing the elements of that crime, it is not error to instruct as to murder in the first and second degrees, though a verdict of murder in either degree might be set aside as not sustained by the evidence; since it is only when the evidence, "without conflict," does not prove the essential elements of the higher offense, that it is error to submit an issue as to it.

**Corroboration: INSTRUCTION.** An instruction given to the jury in a murder trial, that a conviction could not be had on the uncorroborated testimony of an accomplice, is not erroneous in not specifying in what particular the evidence of such accomplice must be corroborated.

**Evidence: ADMISSIONS.** Where there was evidence of verbal admissions, it was not error to fail to instruct that verbal admissions should be received with great caution, where the statements were made deliberately and understandingly, in a conversation in which defendant's purpose was to state the particular facts of his connection with the affray.

**Impeachment: INSTRUCTION.** There was some evidence, by way of contradictions, affecting the credibility of W, who was a witness

for the state and defendant's accomplice; and there was impeaching evidence directed to the general character of the defendant, who was a witness for himself, and of L, who was a witness for the state. The court charged that, if the general character of either of the two witnesses was bad, the jury should consider that fact only in weighing his evidence; and, that, if the jury found that the character of defendant was bad, that fact could rightfully be considered only in determining the weight to be given his evidence   *Held*, that the charge was not open to the objection that the singling out of such two witnesses unduly emphasized the fact of the impairment of defendant's credibility, leaving the inference that, if W was found to be corroborated in any particular, his credibility was unaffected.

*Appeal from Pottawattamie District Court.*—HON. WALTER I. SMITH, Judge.

WEDNESDAY, DECEMBER 15, 1897.

INDICTMENT for murder of the first degree. Verd'ct of guilty, and a judgment thereon, from which the defendant appealed.—*Affirmed.*

*Sims & Bainbridge* and *D. B. Bailey* for appellant.

*Milton Remley*, attorney general, and *Jesse A. Miller* for the state.

GRANGER, J.—I. The defendant, Jackson, was indicted, jointly with one Richard Wallace, for the murder of Richard Baker, a colored man, commonly known as Texas Baker, on the night of November 4, or early morning of November 5, 1895, at Council Bluffs, Iowa.

Some facts are without dispute. One John Webster, the defendant, and Baker, with many others, were in front of the Metropolitan saloon, on Broadway street, in said city, when an altercation arose between Webster and Baker because Webster had taken a cigar from Baker's mouth. Baker left the crowd, and crossed the street, and soon returned; and, as he had crossed the motor track that ran along the

street, he was met by Jackson, who either knocked or pushed him down, so that he lay on his back, with his head between the rails of the motor track, and, while in this position, he was struck by Webster with a club, in the face and on the head two or three times, from which wound Baker died the following morning. Some facts, about which there is a dispute, are these, as claimed by the state: During the altercation over the cigar, Baker put his hand on his hip, as if to take from his pocket a weapon, upon which Webster said, "Look out, boys! He is going to shoot," and started for the saloon door, when Jackson took him by the arm, and said, "Hold on! I'll see you through with it." Baker was then returning from across the street, where he had picked up a couple of bricks, and Jackson and Webster left the sidewalk, and met Baker just as he had crossed the motor track. When within a few feet of Baker, Jackson said to Webster, "Let him come; I will stop him," or "Let him come; I will fix him." That Jackson stepped in front of Webster, and knocked Baker down with his fists. That Baker fell "like a log," his head striking the pavement first, after which he did not speak or move. That Jackson then rushed to his head, and kicked him on the head or face. That then Webster came up, and struck the blows with the club, while Jackson stood within four or five feet of him. That, after Webster had struck the blows, Jackson grabbed hold of him, and said, "Come on; let's get out of here." That they left together, and, when a short distance away, Jackson said, "I am going back, to clear myself with the people." That he soon joined Webster again on a bridge, about a block from the scene, and they went on together, and Jackson tried to have Webster throw the club into the creek. That it was afterwards thrown into an alley, and there found, covered with hair and blood. That, as they proceeded to their homes, Jackson put his finger to Webster's face, and said, "I never hit a prettier lick in my

life." Appellant's version of the disputed facts is that they did not occur as stated; that Webster made no such remark about shooting, and that Jackson did not take him by the arm and say, "Hold on! I'll see you through;" that he did not advance towards Baker with Webster, but alone, and only pushed Baker down when he drew the brick to strike and threatened to kill him; that he did not kick Baker, but that the kicking was done by one Roper; that, when he saw Webster striking Baker with the club, he rushed between Baker and Webster, and told Webster to stop, that he was killing him; and that he (Jackson) caught the third blow on his own leg, to save Baker. The other facts as claimed by appellant are also denied.

II. There is a strenuous contention that the verdict of manslaughter had not support in the evidence. We do not think it is contended that the death resulted from the blow struck by Jackson, but rather from the blows given by Webster with the club. The testimony of the physician who examined Baker before and after death is to the effect that death resulted from hemorrhage. The testimony would clearly sustain a finding that Baker was stunned, and temporarily helpless, from the blow given by Jackson, not, however, saying but that the testimony in that respect is in conflict. The argument deals with the matter of intent or motive on the part of Jackson to do the act. Neither motive nor intent is necessarily an element of the crime of manslaughter. It is true that, under the facts of this case, the fatal blows being given by Webster, there must have been the intention to do an unlawful act, and that the act resulted in the homicide. The intent to do the unlawful act has a clear support in the evidence if some of the facts urged by the state are established. If it is true that when Webster and Baker

engaged in the quarrel of words, and Webster, appre-
hending that Baker was going to shoot, sought safety
by retreating from him,—which was clearly the proper
course to pursue,—Jackson intercepted him with the
remark, "Hold on! I'll see you through," and then
went into an affray with Baker and Webster, the intent
to do the unlawful act is clearly manifest. That they
did go into the affray is not a disputed fact, and we
think a finding that they went into it under such cir-
cumstances has support in the evidence, notwithstand-
ing the conflict. It is true that the movements were not
seen alike by all the witnesses, and this variance in
the testimony is urged as discrediting the evidence to
the effect that Webster and Jackson acted understand-
ingly in their movements, and in what they did. Par-
ticular stress is placed on the fact that some of the
witnesses for the state say that, when Webster came
to Baker, he came from the west, instead of from beside
Jackson, or near him, where some of the witnesses
placed him. On the question of intent the variance is
not material. That Webster was close by when Jack-
son struck the blow, intending to aid in an affray, is not
to be doubted; nor is it to be seriously doubted that
Jackson designed to assist Webster in an encounter
against Baker if he (Baker) should attack him. These
facts, aided by the other, which the jury could have
found, that Webster and Jackson invited the affray by
going into it, rather than by avoiding it, quite conclu-
sively fixed Jackson's relation to the affair as a partici-
pant with Webster in a purpose to do an unlawful act,
which resulted in the death of Baker. That such a
state of facts would justify a verdict against Jackson,
see *State v. Mushrush,* 97 Iowa, 444; *State v. Munch-
rath,* 78 Iowa, 268; *State v. McCahill,* 72 Iowa, 111;
*State v. Malow,* 44 Iowa, 104; *State v. Shelledy,* 8 Iowa,
477. There is something of an attempt, in argument,

to clothe the act of Jackson, in going out to meet Baker, with a chivalrous rather than a criminal motive; that he generously exposed himself to danger in the interest of Webster or others in the crowd of people assembled there. Nothing is clearer to a disinterested reader of the record than that such was not his motive. It is in evidence, but disputed, that, when Webster and Baker were having words about the cigar, Jackson said, "Why don't you stop quarreling and go to fighting?" and also that, as he and Webster advanced towards Baker on the street, Jackson said to Webster, "Let him come; I will stop him." It is true that the latter words might well be used by one about to act solely for the protection of others in a lawful manner, but the record here shows, rather, a disposition to bravado, and a desire to be foremost in the affray. We conclude that, under the state of the evidence, we have no right to disturb the finding of the jury.

III. The defendant was a witness in his own behalf, and one Lawson was a witness for the state. Impeaching evidence directed to the general moral character of each was admitted. The court, in an instruction, referred to such impeaching evidence, and directed that, if the jury found the general moral character of either to be bad, it should take that fact into consideration in determining the weight due to his testimony, and that the evidence could not be considered for any other purpose. The court then said: "And, if you find that the general moral character of this defendant is bad, that fact can rightfully be considered by you only in determining the weight to be given his evidence, and it should not receive any weight aside from that in passing upon his guilt or innocence." It is urged that, inasmuch as there was no dispute over the introduction of the testimony, the instruction could only be considered by the

jury as a command to look with some distrust upon the
testimony of the defendant.   There was some evidence,
by way of contradictions, affecting the credibility of
Webster as a witness; and it is thought that the sin-
gling   out   of   the   two   witnesses   by   the   court
"unduly emphasized the fact of the impairment of the
credibility of the defendant, leaving the inference for
the jury that, if John Webster was found to be corrob-
orated in the testimony that he had given, in any partic-
ular, his credibility as a witness was unaffected."   It
seems to us that the language of the instruction refutes
the criticism.   The instruction attempted to deal with
the effect of impeaching evidence as affecting general
moral character, and, in doing so, it made no distinc-
tion, but was general as to all witnesses of that class.
There seemed to be a manifest purpose in the instruc-
tion to guard the rights of the defendant from prejudice
by strictly limiting the effect of the impeaching testi-
mony, and not permitting the fact of impeachment, if
found, to weigh against the defendant otherwise than
as affecting his testimony.   Of that, appellant should
not complain.

IV.   One Lawson was a witness for the state, and
gave testimony as to admissions made to him by Jack-
son while both were confined in jail.   The testimony
was as to what occurred at the time Baker was
killed, and in some important particulars it con-
tradicts Jackson's testimony given on the trial.
Appellant refers to *Allen v. Kirk*, 81 Iowa, 658, and
other cases, in which a rule has been stated to the effect
that, as a general rule, verbal admissions of a party
should be received with great caution, as that kind of
evidence is subject to imperfections and mistakes; and
it is urged that it was error for the court not to caution
the jury in regard to the testimony of Lawson.   The
same authority that announces the above rule also holds

that such admissions of a party to a suit, when made understandingly and deliberately, often afford satisfactory evidence. The reason for the general rule is that such admissions often come from loose and random conversation, without a purpose to express what the hearers may understand. Conceding Lawson's statements to be true, the statements by Jackson seem to have been made deliberately and understandingly, in a conversation in which his purpose was to state the particular facts of his connection with the affray. Under such circumstances, we do not think a failure to caution the jury in the respect suggested involved error.

V. In an instruction, the court gave the statutory rule that a conviction could not be had on the testimony of an accomplice without corroboration, and that the corroboration was not sufficient if it merely showed the commission of the offense or the circumstances thereof. Webster was the accomplice, and a witness, and it is said that the court should have gone further, and enlightened the jury as to the particular feature of the case in which Webster should have been corroborated. The corroboration, under the statute, must have been such as would tend to connect the defendant with the commission of the offense charged, and the jury was so told. The instruction placed upon the jury the statutory limitation that the corroboration could not come from facts that merely showed the commission of the offense or the circumstances thereof, and then left it to the jury to say whether or not there was corroboration in the other evidence. We think such an instruction conforms to the requirements of the law. That other evidence did so tend is not open to question. It may further be said that the instruction, at the time of the trial, seemed to be so satisfactory that no modification of it was asked,

VI. The indictment was for murder of the first degree, and the court submitted the case to the jury upon instructions as to the crime charged and all degrees of crime included therein; and it is now urged that it was error to instruct upon the crime of murder of either degree, because the evidence is so clearly insufficient to sustain a verdict for murder that a court could not permit such a verdict to stand. It is conceded in argument that there has been an acquittal of the crime of murder, because of the verdict of manslaughter. In *State v. Kyne,* 86 Iowa, 616, we held that under an indictment for rape,—and there was a conviction only of an assault with an attempt to commit rape,—it was error to put the defendant on trial for the higher degree of the crime when the evidence showed, without conflict, that all the essential elements of the crime had not been proven. It is thought that rule should apply to this case, but we think not, for the reason that it does not appear without conflict in this case that defendant was not guilt, of the higher crimes. We have not held that in a case where we might set aside a verdict for a higher crime, as not sustained by the evidence, it would be error for the trial court to submit to the jury the issue as to such crime; but wh·n, without conflict, the essential elements of a crime are not proven, it is error to submit such an issue. We are far from believing that there is no evidence in this case tending to show the elements of even murder of the first degree. There is evidence tending to show an understanding with Webster to go into the affray; that Jackson knocked Baker down, and rendered him helpless; that he stood by and saw Webster give the fatal blows, after he had felled the victim, without a word of dissent or protest, until he thought Baker was dead, when he said to Webster,

"Go on now; you have killed him," and suggested making their escape. These are facts tending to show deliberation, premeditation, and malice. Even though other evidence might so outweigh this as to require a court to set aside a verdict for an offense higher than manslaughter, it was not error for the court to submit to the jury the issues presented by the indictment and plea as to murder. The judgment will stand AFFIRMED.