STATE v. HORTON.

(Filed October 24, 1905).

*Excusable Homicide—Offense Malum in se—Malum Prohibitum.*

1. Where the defendant, while hunting on lands without written permission of the owner, as required by statute, killed the deceased unintentionally, and the special verdict having found that the act in which the defendant was engaged was not in itself dangerous to human life and negatived all idea of negligence, *held,* that the case is one of excusable homicide, as the offense was *malum prohibitum.*

2. An offense *malum in se* is one which is naturally evil, as murder, theft and the like. Offenses at common law are generally *malum in se.* An offense *malum prohibitum,* on the contrary, is not naturally evil, but becomes so in consequence of being forbidden.

INDICTMENT for manslaughter against W. P. Horton, heard by *Judge W. B. Councill* and a jury, at April Term, 1905, of

the Superior Court of FRANKLIN County. The jury ren-
dered a special verdict, and such verdict and proceedings
thereon are as follows:

"That in the month of November, 1904, to-wit: on the——
day thereof, the defendant, W. P. Horton, was hunting tur-
keys on the lands of another; that the following local statute,
enacted by the General Assembly of 1901, was in force at and
in the place in which said defendant was hunting, to-wit:
chapter 410 of the Laws of 1901; that the said Horton at
the time he was so hunting, had not the written consent of the
owner of said land, or of his lawful agent; that while so en-
gaged in hunting he killed Charlie Hunt, the deceased, but
that said killing was wholly unintentional; that the shooting
of the deceased was done while the defendant was under the
impression and belief that he was shooting at a wild turkey;
that the hunting engaged in by the defendant was not of itself
dangerous to human life, nor was he reckless in the manner
of hunting or of handling the firearm with which the killing
was done; that hunting at that season was not forbidden un-
der the general game law of the State, but was prohibited
only by the special statute referred to; that the shooting from
which the killing resulted was not done in such grossly care-
less or negligent manner as to imply any moral turpitude, or
to indicate any indifference to the safeguarding of human
life; that, but for the said statute herein incorporated, the
killing of the deceased by defendant does not constitute any
violation of the law. If upon the above findings of fact, the
court should be of opinion that the defendant is guilty of
manslaughter, we for our verdict find the defendant guilty
of manslaughter, but if the court should be of opinion that
the defendant is not guilty, we for our verdict find
that the defendant is not guilty." Upon this special finding,
the court being of opinion that the defendant was guilty of
manslaughter, so adjudged and ordered a verdict of guilty
of manslaughter to be entered, and gave judgment that the

defendant be imprisoned in the county jail of Franklin, for a period of four months. Defendant excepted to the ruling of the court, and appealed from the judgment against him.

*Robert D. Gilmer, Attorney-General,* for the State.
*F. S. Spruill* and *W. H. Ruffin* for the defendant.

HOKE, J., after stating the case: It will be noted that the finding of the jury declares that the act of the defendant was not in itself dangerous to human life, and excludes every element of criminal negligence, and rests the guilt or innocence of the defendant on the fact alone that at the time of the homicide the defendant was hunting on another's land without written permission from the owner. The act which applies only in the counties of Orange, Franklin and Scotland, makes the conduct a misdemeanor, and imposes a punishment on conviction, of not less than five nor more than ten dollars.

The statement sometimes appears in works of approved excellence to the effect that an unintentional homicide is a criminal offense when occasioned by a person engaged at the time in an unlawful act. In nearly every instance, however, will be found the qualification that if the act in question is free from negligence, and not in itself of dangerous tendency, and the criminality must arise, if at all, entirely from the fact that it is unlawful, in such case, the unlawful act must be one that is *malum in se* and not merely *malum prohibitum,* and this we hold to be the correct doctrine. In Foster's Crown Law, it is thus stated at page 258: "In order to bring a case within this description (excusable homicide) the act upon which death ensueth must be lawful. For if the act be unlawful, I mean if it be *malum in se,* the case will amount to felony, either murder or manslaughter, as circumstances may vary the nature of it. If it be done in prosecution of a felonious intent, it will be murder; but if the intent went no further than to commit a bare trespass, it will be

manslaughter." At page 259, the same author puts an instance with his comments thereon as follows: "A shooteth at the poultry of B and by accident killeth a man; if his intention was to steal the poultry, which must be collected from circumstances, it will be murder by reason of that felonious intent, but if it was done wantonly and without that intention, it will be barely manslaughter. The rule I have laid down supposeth that the act from which death ensued was *malum in se.* For if it was barely *malum prohibitum,* as shooting at game by a person not qualified by statute law to keep or use a gun for that purpose, the case of a person so offending will fall under the same rule as that of a qualified man. For the statutes prohibiting the destruction of the game under certain penalties will not, in a question of this kind, enhance the accident beyond its intrinsic moment."

One of these disqualifying statutes here referred to as an instance of *malum prohibitum* was an act passed (13 Richard II, chap. 13,) to prevent certain classes of persons from keeping dogs, nets or engines to destroy game, etc., and the punishment imposed on conviction was one year's imprisonment. There were others imposing a lesser penalty.

Bishop in his work, entitled New Criminal Law, vol. 1, sec. 332, treats of the matter as follows: "In these cases of an unintended evil result, the intent whence the act accidentally sprang must probably be, if specific, to do a thing which is *malum in se* and not merely *malum prohibitum.*" Thus *Archbold* says: "When a man in the execution of one act, by misfortune or chance and not designedly, does another act for which, if he had wilfully committed it, he would be liable to be punished—in that case, if the act he were doing were lawful or merely *malum prohibitum,* he shall not be punishable for the act arising from misfortune or chance, but if it be *malum in se,* it is otherwise. To illustrate: since it is *malum prohibitum,* not *malum in se,* for an unauthorized person to kill game in England contrary to the statutes, if,

in unlawfully shooting at game, he accidently kills a man, it is no more criminal in him than if he were authorized. But, to shoot at another's fowls, wantonly or in sport, an act which is *malum in se,* though a civil trespass, and thereby accidentally to kill a human being is manslaughter. If the intent in the shooting were to commit larceny of the fowls, we have seen that it would be murder." To same effect is *Estelle v. State,* 21 N. J. Law, 182; *Com. v. Adams,* 114 Mass., 323.

An offense *malum in se* is properly defined as one which is naturally evil as adjudged by the sense of a civilized community, whereas an act *malum prohibitum* is wrong only because made so by statute. For the reason that acts *mala in se* have, as a rule, become criminal offenses by the course and development of the common law, an impression has sometimes obtained that only acts can be so classified which the common law makes criminal, but this is not at all the test. An act can be, and frequently is, *malum in se,* when it amounts only to a civil trespass, provided it has a malicious element or manifests an evil nature, or wrongful disposition to harm or injure another in his person or property. Bishop Cr. Law, *supra; Com. v. Adams, supra.*

The distinction between the two classes of acts is well stated in 19 Am. & Eng. Enc. (2nd Ed.), at p. 705: "An offense *malum in se* is one which is naturally evil, as murder, theft, and the like. Offenses at common law are generally *malum in se.* An offense *malum prohibitum,* on the contrary, is not naturally an evil, but becomes so in consequence of being forbidden."

We do not hesitate to declare that the offense of the defendant in hunting on the land without written permission of the owner was *malum prohibitum,* and the special verdict having found that the act in which the defendant was engaged was not in itself dangerous to human life, and negatived all idea of negligence, we hold that the case is one of excusable homicide, and the defendant should be declared not guilty.

We are referred by the Attorney-General to East's Pleas of the Crown, and Hale's Pleas of the Crown, as authorities against this position: We would be slow indeed to hold that the law differed from what these eminent authors declared it to be in their day and time, nor are we required to do· so, for a careful examination of their writings will, we think, confirm the views expressed by the court. My Lord Hale does say in volume 1, p. 39, that "If a man do *ex intentione* an unlawful act, tending to the bodily hurt of any person, as by striking or beating him, though he did not intend to kill him, but the death of the party struck, follow thereby within the year and day; or if he strike at one and missing him kill another whom he did not intend, this is felony and homicide, and not casualty or *per infortunium.*" "So it is, if he be doing an unlawful act though not intending bodily harm to any person, as throwing a stone at another's horse, if it hit a person and kill him, this is felony and homicide, and not *per infortunium,* for the act was voluntary, though the event was not intended, and therefore the act itself being unlawful, he is criminally guilty of the consequence that follows."

But this author says in treating of the same subject, at pp. 475, 476: "So if A throws a stone at a bird, and the stone striketh and killeth another to whom he intended no harm, it is *per infortunium,* but if he had thrown the stone to kill the poultry or cattle of B, and the stone hits and kills a bystander, it is manslaughter because the act was unlawful; but not murder because he did not maliciously or with intent to hurt the bystander * * * By the statute of 33 Henry VIII, chap. 6, no person not having lands, etc., of the yearly value of one hundred pounds per annum may keep or shoot a gun, upon pain of forfeiture of ten pounds. Suppose, therefore, such a person, not qualified, shoot with a gun at a bird or at crows, and by mischance it kills a bystander, by the breaking of the gun or some other accident, that in another case would have amounted only to chance-medley, this will be no more

than chance-medley in him; for though the statute prohibits him to keep or shoot a gun, yet the same was but *malum pro-hibitum,* and that only under a penalty, and will not enhance the effect beyond its nature."

Mr. East, while he gives an instance which apparently supports the view of the State, in treating further on the subject in volume 1, p. 255, says: "Homicide in the prosecution of some act or purpose criminal or unlawful in itself, wherein death ensues collaterally to or beside the principal intent; I say collaterally to or beside the principal intent in order to distinguish this kind of homicide from that before treated of under the general head of malice aforethought, where the immediate and leading purpose of the mind was destruction to another. And first, it is principally to be observed that if the act on which death ensue be *malum in se,* it will be murder or manslaughter according to the circumstances; if done in the prosecution of a felonious intent, however, the death ensued against or beside the intent of the party, it will be murder; but if the intent went no further than to commit a bare trespass, it will be manslaughter. As where A shoots at the poultry of B, and by accident kills a man; if his intent were to steal the poultry, which must be collected from circumstances, it will be murder by reason of that felonious intent; but if it were done wantonly and without that intent, it will be barely manslaughter. A whips a horse on which B is riding, whereupon the horse springs out and runs over a child and kills it; this is manslaughter in A and misadventure in B." And again, at page 257: "So if one be doing an unlawful act, though not intending bodily harm to any person, as throwing at another's horse, if it hit a person and kill him, it is manslaughter. Yet in each case it seems that the guilt would rather depend on one or other of these circumstances; either that the act might probably breed danger or that it was done with a mischievous intent."

So we have it, that both Sir Matthew Hale and Mr. East,

to whom we were referred as supporting the claim of guilt, declared that the act must be *malum in se,* and the instances given by them show that these writers had this qualification in mind whenever they state the doctrine in more general terms.

Sir William Blackstone also says in volume 4, pp. 192, 193: "And in general when an involuntary killing happens in consequence of an unlawful act, it will be either murder or manslaughter, according to the nature of the act which occasions it. If it be in prosecution of a felonious intent, or its consequences naturally tended to bloodshed, it will be murder; but if no more was intended than a mere civil trespass, it will be manslaughter"—citing Foster's Criminal Law. We take it that the distinguished commentator must have intended only such civil trespasses as involve an element *malum in se,* as he cites Foster's Criminal Law, and this author, as we have seen, states the qualification suggested.

Again, we are cited by the State to an instance put by East at p. 269: "But though the weapons be of a dangerous nature yet if they be not directed by the person, using them against each other, and so no danger to be reasonably apprehended, and if death casually ensue, it is but manslaughter; as if persons be shooting at game, or butts, or any other lawful object, and a bystander be killed. And it makes no difference with respect to game whether the party be qualified or not, but if the act be unlawful in itself, as shooting at deer in another's park without leave, though in sport and without any felonious intent, whereby a bystander is killed; it will be manslaughter; but if the owner had given leave or the party had been shooting in his own park, it would only have been misadventure." Lord Hale, at page 475, gives the same instance. And it is urged that this instance is exactly similar to the one before us, but not so.

According to Sir William Blackstone, in his commentaries, book 2, p. 415: "For sometime prior to the Norman Con-

quest, every freeholder had the full liberty of sporting upon his own territories, provided he abstained from the king's forests, as is fully expressed in the laws of Canute and Edward the Confessor. *Cuique enim in proprio fundo quamlibet feram quoquo modo venari permissum.*" And further on it is said: "That if a man shoots game on another's private ground and kills it there, the property belongs to him on whose ground it was killed. The property arising *ratione soli* * * * On the Norman Conquest, a new doctrine took place, and the right of pursuing and taking all beasts ·of chase or venary, and such·other animals as were accounted game, was then held to belong to the king, or to such only as were authorized under him." Again: "But if the king reserve to himself the forests for his own exclusive diversion, so he granted from time to time, other ·tracts of land to his subjects under the name of chases or parks, or gave them license to make such in their own parks. And, by the common law, no one is at liberty to take or kill any beast of chase but such as hath an ancient chase or park." In Enc. Brittanica we read that the chases or parks were much the same, except that the parks were enclosed, having a tendency to make the game, contained therein, more completely and exclusively the property of the owner. Anyone who entered them was a trespasser, and in shooting the game therein, his act can be likened to that of the case put by Foster, East and Lord Hale, where one wantonly shot another's chicken. He was engaged in the effort to destroy another's property, and the act could well be considered *malum in se.* But not so here. We have never transplated to this country either the Saxon or Norman theory as to the right to take and appropriate game. Here, it is considered the property of the captor, except perhaps, in the case of bees.

It is said in Cooley on Torts: "As regards beasts of chase, the English law is that if a hunter shoots and captures a beast on the land of another, the property is in him as in the

owner·of the land. Under the civil law, the property passed to the captor. And such is believed to be the recognized rule in America, even where the capture has been effected by means of a trespass on another's land." *State v. House,* 65 N. C., 315.

The act of the defendant, therefore, was not in the effort to destroy another's property, but was strictly *malum prohibitum*. *State v. Vines,* 93 N. C., 493, and *State v. Dorsey,* 118 Ind., 167, · are cases apparently opposed to our present decision, but neither is really so. In *State v. Vines* the sport was imminently dangerous, amounting to recklessness; and in *State v. Dorsey* the element of criminal negligence was also present, and in this case a State statute governing the construction was given much weight. Neither the one case nor the other required any critical examination of the doctrine as sometimes stated, that an unintentional homicide, occasioned when in the commission of an unlawful act, is manslaughter. The verdict in the case before us negatives both the elements of guilt (present in these two cases), declaring that the act was not in itself dangerous and that the defendant was not negligent.

Again, it has been called to our attention that courts of the highest authority have declared that the distinction between *malum prohibitum* and *malum in se* is unsound, and has now entirely disappeared. Our own court so held in *Sharp v. Farmer,* 20 N. C., 255, and decisions to the same effect have been made several times since. Said *Ruffin, C. J.,* in *Sharp v. Farmer:* "The distinction between an act *malum in se* and one *malum prohibitum* was never sound and is entirely disregarded, for the law would be false to itself if it allowed a party through its tribunals to derive advantage from a contract made against the intent and express provisions of the law." It will be noted that this decision was on a case involving the validity of a contract, and the principle there established is undoubtedly correct. The fact, however, that the

judge who delivered the opinion uses the words "was never sound," and that other opinions to the same effect use the words "has disappeared," shows that the distinction has existed; and it existed too at a time when this feature in the law of homicide was established. And we are well assured that because the courts, in administering the law on the civil side of the docket, have come to the conclusion that a principle once established is unsound and should be rejected, this should not have the effect of changing the character of an act from innocence to guilt, which had its status fixed when the distinction was recognized and enforced.

It was further suggested that the homicide was one of the very results which the statute was designed to prevent, and to excuse the defendant would be contrary to the policy of the act. But this can hardly be seriously maintained. It will be noted that it was not the owner of the land who was killed, but the defendant's comrade in the hunt; and of a certainty, if our Legislature thought that conduct like that of the defendant was dangerous and the statute was designed to protect human life, some other penalty would have been imposed than a fine of "not less than five dollars and not more than ten." It is more reasonable to conclude that the act in its purpose was designed to prevent and suppress petty trespasses and annoyances, such as leaving open gates, throwing down fences, treading over crops, etc.

The special verdict having established that the act of the defendant was entirely accidental, it is a relief that we can declare him innocent in accordance with accepted doctrine, and that in the case at bar the law can be administered in mercy as well as justice. Quoting again from that eminent judge and humane and enlightened man, Sir Michael Foster: "And where the rigor of law bordereth upon injustice, mercy should, if possible, interpose in the administration. It is not the part of the judges to be perpetually hunting after forfeitures, where the heart is free from guilt. They are

ministers appointed by the Crown for the ends of public jus-
tice, and should have written on their hearts the solemn en-
gagement His Majesty is under to cause law and justice in
mercy to be executed in all his judgments." We know that
in this spirit the judge below dealt with the defendant and
his cause; for though the judgment of His Honor impelled
him to the conclusion of guilt, he imposed the lightest punish-
ment permissible for the offense.

There was error in holding the defendant guilty, and, on
the facts declared, a verdict of not guilty should be directed
and the defendant discharged.

Reversed.

WALKER, J., concurs in result only.