## PEOPLE *v.* BARNES.

1. Criminal Law — Evidence — Speed — Automobiles—Expert or Opinion Evidence—Judgment as to Speed.

Upon the trial of a respondent charged with negligently killing a young girl by colliding with her in operating an automobile on a public highway at an excessive rate of speed, the trial court erred in admitting the testimony of an eyewitness that the average speed before reaching a point 50 or 60 feet behind the decedent from a place about a mile distant was 30 miles an hour; the court taking judicial notice of the fact that a competent chauffeur, as the respondent was shown to be, would be able to change the speed at different points.[1]

2. Same — Homicide — Criminal Negligence — Manslaughter — Motor Vehicle Law—Evidence.

It was also incompetent to introduce testimony showing the rate of speed of an automobile that was like the car which

---

[1] On the question of evidence as to speed of automobile, see note in 34 L. R. A. (N. S.) 778.

respondent was driving, more than a mile and a half away from the place of accident, the identification by such witness being incomplete; as the point at which the observation was made was too remote from the place of accident.

3. Same—Trial—Charge.

The trial court in its charge to the jury should not have eliminated the questions of proximate cause and the negligence of decedent by instructing the jury that if at the time the accused ran upon the deceased he was operating his car in excess of ten miles an hour he was guilty of manslaughter: respondent was, also, entitled to have the jury consider the question whether he was aware that he was doing the alleged unlawful act, as bearing upon the charge of gross negligence.

4. Same—Motor Vehicle Law.

Although a wilful violation of the statute might constitute negligence, it does not follow that such negligence would, under the circumstances of each case, amount to manslaughter.

5. Same—Proximate Cause—Contributory Negligence.

The questions for the jury to determine were whether the act of the respondent in driving at an excessive rate of speed was the proximate cause of the death of decedent: and whether respondent was responsible under the law whether her failure to use due care contributed or not to her injury.

6. Same—Excessive Speed.

It must be made to appear in such a proceeding that the homicide was the natural and necessary result of the unlawful act; that death ensued because of, and as a direct and natural result of, the recklessness or gross negligence of the respondent.

7. Same—Negligence—Manslaughter.

Not every degree of carelessness or negligence renders a party guilty of manslaughter; the case may be one of mere misadventure; to warrant a conviction, there must have been gross negligence, which is criminal and, within certain limits, supplies the place of affirmative criminal intent.[1]

Exceptions before sentence from Ingham; Wiest,

[1] As to homicide by negligent operation of automobile, see notes in 30 L. R. A. (N. S.) 458 and 33 L. R. A. (N. S.) 403.

J. Submitted April 23, 1914. (Docket No. 165.) Decided July 25, 1914.

William G. Barnes was convicted of manslaughter. Reversed.

*Grant Fellows,* Attorney General, and *Charles H. Hayden,* Prosecuting Attorney (*L. B. McArthur,* of counsel), for the people.

*L. B. Gardner* and *Frank L. Dodge,* for respondent.

STONE, J. The respondent was charged with, and was convicted of, the crime of manslaughter. It is alleged and claimed by the people that about 2 o'clock p. m., on May 27, 1911, while driving an automobile in the township of Lansing, on Michigan avenue east, the same being a public highway and thoroughfare, and while going east toward the Agricultural college, and when in front of what is known .as the Baker house, the respondent carelessly, recklessly, negligently, wantonly, wilfully, and feloniously operated said automobile at an excessive, reckless, and dangerous rate of speed, to wit, 20 miles an hour; that he then and there carelessly, recklessly, wantonly, wilfully, and feloniously neglected and failed to keep a necessary and proper lookout for pedestrians upon said public highway, and did then and there carelessly, recklessly, wantonly, wilfully, and feloniously neglect to sound his horn, or to give other necessary and proper warning of the approach of said automobile, and did then and there in the manner aforesaid neglect and fail to keep and have said automobile within his proper management and control, and, as a result of operating said automobile in the manner aforesaid, respondent did then and there operate and drive said automobile against, upon, and over one Mary Robb, a young woman of the age of 16 years and upwards, and did inflict upon the body of said Mary Robb such

injuries as produced her immediate death, concluding in the technical language of the statute that the respondent thereby wilfully and unlawfully did kill and slay the said Mary Robb.

The evidence on the part of the people upon the trial tended to show that the respondent and another young man, a friend of his, started to go upon said avenue to the Agricultural college, the respondent operating an Oakland 30 horse power roadster automobile, painted red; that while on their way they stopped near the Union depot, in the city of Lansing, and purchased two cigars, and then continued their journey east. The rate of speed at which the respondent drove is in dispute. On the part of the people there was evidence tending to show that from a mile and a half west of where the accident occurred to within a few rods of the place of the accident the automobile was being driven by the respondent at a rate of speed of from 30 to 40 miles an hour; that after it struck or ran over the girl he was running from 17 to 20 miles an hour. It is undisputed that, as they went down the small hill near the race track east of the city limits, they saw Mary Robb and a younger companion going east in the wrought portion of the highway; the highway being about 30 feet wide. There was evidence tending to show that the respondent sounded the horn while going down the hill and again when within 50 or 60 feet of the girls. The respondent himself testified that, until they approached within 50 or 60 feet of the girls, they did not at any time in their speed exceed 15 to 18 miles an hour. The respondent upon his direct examination testified as follows:

"From the time that we left the cigar store until we came to the hill near the race track, we drove the car from 15 not to exceed 18 miles an hour. The highway on Michigan avenue east is 27 to 30 feet wide. I saw the two girls ahead of us. I do not

remember of my attention being called to them; I remember that I saw them just after going over the race track hill. Do not remember sounding my horn back at the race track; the girls were a little south of the wrought portion of the road. They had parasols with them. I was then coming down about the center of the road on the macadam part of the road. In the highway from the city limits out to the Baker home, there was most of the way ruts, varying in depth, where automobiles had run along.

"*Q.* Did you, before the girl was struck, sound your horn?

"*A.* Yes, sir.

"*Q.* Within about how many feet, in your best judgment, was it that you sounded the horn?

"*A.* Fifty or sixty feet; it might have been further than that. At about the time I sounded the horn I started to turn to the north from center of the highway. The girls were a little to the south of the center of the highway. I sounded my horn when I started to bear out to the north; I was going probably 15 miles an hour, not to exceed 18. I reduced the speed after that; I did not exceed the speed of 15 or 18 miles an hour from the time I saw the girls up toward the hill to the point where I began to turn out to the north. The girls went a little to the north; took a couple of steps to the north; I got within a few feet of them, and the Robb girl got in front of the machine. At that I turned as far to the north as I could; I did not have time to stop. I thought I could miss her by turning the car; I turned as far to the north as I could, and the fender struck her and brushed her down. The Robb girl that was injured was on the south side of the two girls, or on the right-hand side in the direction that they were going; the Taylor girl was on the left or north side. The girls were walking along to the east about as close as they could walk comfortably, side by side. The girls started to the north shortly after I blew the horn; they both turned around. When they started to the north, I would estimate the distance to be 25 or 30 feet that the machine was west of the girls. I did reduce the speed from the point that I was beginning to bear out from the north.

"*Q.* Was there any doubt in your mind at that time that you would be able to pass the girls safely?

"*A.* Not a bit. I had plenty of room to pass them; I expected to pass them all right.

"*Q.* Now what rate of speed did you reduce that machine before you struck the Robb girl?

"*A.* I reduced it to 8 or 10 miles an hour, not to exceed 10 miles an hour.

"*Q.* Not to exceed 10 miles an hour?

"*A.* No, sir; when the Robb girl darted to the north, the Taylor girl went to the south. I did not have time enough to reach over and catch the lever and draw it back and put on the emergency brake. I think the car would have reached the girl, had I attempted that, before I could have applied that brake. I stated that I started to bear out to the north as I approached these girls about 50 or 60 feet west of them. I reduced the speed of my automobile from where the girls were, a distance back of about 30 or 40 feet, to 8 or 10 miles an hour; after I blew the horn I turned the car to the left, to the north of the road, threw out the clutch, put the brake on, slackened the speed of the car down to 8 or 10 miles an hour, and expected to pass the girls all right. I had plenty of room. I got within a few feet of them; the Taylor girl went to the south, and the Robb girl started to the north. I did not have time then to stop the car, so I turned as far as I could; that would be to the north. * * * There was not the slightest warning at all given on the part of the Robb girl before she darted out in front of our car. I expected to pass them all right; I had plenty of room."

On cross-examination the respondent testified as follows:

"I saw those girls after I broke over the hill, with their umbrellas up, going to the east. They were close to a half mile ahead of me, I guess. There was no obstruction, a clear view. My car at that time was in perfect condition; that is, I had power to control it. At the place of the accident the traveled portion of the road was about 30 feet. My automobile was 6 feet over all. * * *

"*Q.* You were directly back of the girls when you blew your horn?

"*A.* Yes, sir; I would say about 50 or 60 feet as near as I can remember it. I did not think that they would get out of the highway; no, sir. I thought they would stay where they were. I had plenty of room to pass them to the left. It was right and proper I should turn to the left to go by them.   \*   \*   \*

"*Q.* You say that you supposed that they knew you were going to pass them?

"*A.* I should say, I blew the horn to warn them I was going to pass them.

"*Q.* Isn't this true that when you blew your horn you didn't intend to pass?

"*A.* I certainly did intend to.

"*Q.* Didn't you blow your horn for them to get out of the highway?

"*A.* No, sir; I didn't. I blew my horn to attract their attention to let them know I was coming. I was directly back of them, and they were in front of me, when I blew the horn. They were a little to the south of the center of the highway. I might have got by them on the south side. There were three tracks there. When I blew the horn the girls looked around. I started to turn out about the same time I blew the horn. When I blew the horn the girls looked around; they took a couple of steps east, then started toward the north of the road a couple of steps, then they stopped. I supposed they were going to stand there, and then I had room to pass them. I got up within a few feet of them; the Taylor girl went to the south of the road, and the Robb girl got right out in front of the machine, and I did not have time to stop. The only thing I could do was to turn to the left. Going at the rate of 18 miles an hour, I could have stopped my machine on that day in 25 or 30 feet, I should say. From the time I sounded my horn I could have stopped, if it had been necessary. I did not attempt to stop. I had plenty of room to pass them. At the time I saw these girls ahead of me 50 or 60 feet away, I could have stopped my machine in 25 or 30 feet; the reason I didn't do it was that I had plenty of room to pass the girls. I expected to pass them all right, and I turned out for the purpose of passing the girls.

When the girls took the couple of steps to the east they did it quickly. I did not think they were excited. The Robb girl started and ran from the center of the beaten track to where I struck her. I don't think it was 12 feet from where she started to where I struck her. The Robb girl was a little to the right or south of the center of the highway when I blew my horn. She had not gotten out of· the beaten track when I struck her."

William H. Peavey, the companion of the respondent at the time of the accident, was sworn as a witness for the people. He testified, in substance, that when they were going down the hill near the race track, they saw the two girls in the road ahead of them; that witness remarked to the respondent, who was driving the car, that there was somebody ahead of them; that, while respondent made no reply, he blew the horn pretty close to that time. The following occurred upon his direct examination:

"I remember of hearing the horn sounded again before the girl was struck; it was a point I should judge 50 feet from the girls, as near as my recollection, I would say so. The last time was one long, straight blast of the horn, as near as I can remember. When this last sound was given, the girls, I think, looked around, after we saw the girls from the hill. Mr. Barnes slackened the speed of the auto; he slackened the speed, it seems to me, just previous to or before he sounded his horn the last time. I have a judgment as to the speed of the auto at the time the horn was sounded the last time previous to his slackening the speed; I should say not over 20 or 25 miles an hour we were going.

"Q. Mr. Peavey, what would you say was the speed of that automobile? Give your best judgment, if you have any, on the subject as to the *average speed* of that auto from the time you left or after Mr. Barnes purchased the cigars up to the time he slackened the speed when within about 50 feet of the girls as you say.

"*Respondent's Counsel:* That is objected.to as incompetent and immaterial, the *average speed*.

"*Prosecuting Attorney:* I submit that it is very material.

"*Respondent's Counsel:* We would like to assign the further reason that the distance back would be too remote; it being over a mile away from the scene of the accident.

"*The Court:* He may answer. (An exception.)

"*A.* I don't know; as near as I could tell 30 miles an hour."

Walter S. Foster was called as a witness for the people and testified:

"I live at 1110 Michigan avenue east, Lansing. Have a laundry out there. It is six or eight blocks west of the east end of the pavement [Bingham street intersection]. I remember the day of the accident. I was on my porch painting the floor in the afternoon. I saw a red automobile go by that afternoon. I did not know Mr. Barnes at that time. I do not remember of seeing more than one red automobile. It was 5 minutes after 2 by my watch when I finished painting. It was a red automobile, with a black top; there were two persons in it. Have lived on Michigan avenue for three years; have noticed the operation of automobiles and other moving objects, such as horses and vehicles and horse racing. Have rode in automobiles; had occasion to observe how fast they were going while riding in them by looking at the speedometer.

"*Q.* Tell the jury, in your own opinion, what speed the car was running when it went by.

"*Respondent's Counsel:* I object to that as incompetent, having no tendency to show the rate of speed at the time this automobile met with this accident. It has no tendency to show any issue in this case. It is at least a mile and a quarter—I think it would be conceded to be more than that—from the scene of the accident.

"*Counsel for the People:* We will not concede that.

"*Respondent's Counsel:* Suppose this was the car in question, and he undertook to show that necessarily it was placed within that point and the scene of the accident; it was going 5 or 10 miles an hour; it would

have no bearing on the speed of the car the speed the car might be going at the time of the accident.

"*The Court:* Standing alone, this testimony would not be admissible; but in connection with the other testimony given I think it is for the consideration of the jury, and I will take occasion later on to explain to the jury the limit to be given this testimony. (Exception by respondent's counsel.)

"*A.* Forty miles an hour."

As a witness for the respondent, the county surveyor testified to some actual measurements made by him which appear to be uncontradicted. Among other things he testified:

"From the Baker driveway to Bingham street as it intersects Michigan avenue, it is about 20 rods more than a mile and a half, or a mile and 180 rods. * * * From the end of the pavement to the Baker house is 35 rods less than a mile. * * * Standing in the highway, you can see west from the Baker home a little over a half mile."

In its charge the trial court called the attention of the jury to the following provisions of the statute relating to the operation of motor vehicles upon public highways:

"No person shall operate a motor vehicle upon a public highway at a rate of speed greater than is reasonable and proper, having regard to the traffic and use of the highway, or so as to endanger the life or limb of any person or the safety of any property. * * * Upon approaching a person walking in the roadway of a public highway, * * * a person operating a motor vehicle shall slow down to a speed not exceeding ten miles an hour and give reasonable warning of its approach, and use every reasonable precaution to insure the safety of such person."

In charging the jury, the trial court used the following language:

"Was the automobile driven by respondent up to the person of Mary Robb at a speed in excess of 10 miles an hour? If so, it was an unlawful act on re-

spondent's part, and, if in doing so he killed Mary Robb, the act was manslaughter. * * *

"When respondent approached the two girls in the highway, was he driving the automobile at an unlawful and prohibited speed; that is, did he drive at a speed exceeding 10 miles per hour up to the time the automobile struck Mary Robb? If so, then he may be found guilty of manslaughter, even though he made the best endeavor possible under such speed to avert the accident, and even though Mary Robb, in bewilderment, or heedlessness, or carelessness, ran in front of the automobile, for in such event he was doing an unlawful act in violating the speed regulation, and the law will not excuse him from the consequences for his unlawful behavior, on the ground that Mary Robb, in the excitement of the occasion, did not act with proper judgment."

Upon the conviction of the respondent of the crime of manslaughter, he has brought the case here for review upon exceptions before sentence.

There are numerous assignments of error, many of which we shall not speak of specifically, and it may be said that some of them are without merit.

The fifth assignment of error is to the effect that the court erred in permitting the witness Peavey to testify as to the average rate of speed of the automobile operated by the respondent from the time they purchased the cigars up to the time he slackened the speed when within about 50 feet of the girls in the highway.

By the eighteenth assignment of error it is claimed that the court erred in permitting the witness Foster to testify as to the speed of an automobile when it went by his place, at or near the intersection of Bingham street.

Error is also assigned upon that portion of the charge above quoted.

1. In our opinion it was prejudicial error to permit the witness Peavey to testify as to his judgment of the *average speed* of the automobile from the place

where the respondent purchased the cigars near the Union depot until he slackened the speed when within about 50 or 60 feet of the girls in the highway. It is common knowledge, and we will take notice of the fact, that a competent chauffeur, as it is uncontradicted the respondent was, would so be able to control and change the speed of an automobile at different points in the space covered that it would, in our judgment, be no aid to, or criterion for, the jury to know what the *average speed* of the automobile was upon this occasion.

2. We are of opinion that the testimony of the witness Foster as to the rate of speed of the automobile which he saw driven upon the day in question at a point six or eight blocks west of the east end of the pavement, over a mile and a half away, was too remote and vague to identify the automobile in question, and too immaterial to be submitted to a jury in the trial of a criminal case. In our opinion it was prejudicial error. It is true that the court in its charge called the attention of the jury to the use which might be made of such testimony. That language was as follows:

"Some witnesses to the speed of the car, at a distance from the place of the accident, did not undertake to identify respondent as the driver, and it now rests for you to determine from all the evidence whether the automobile such witnesses described, and upon the speed of which they have given their judgment, was the automobile driven by respondent on the journey upon which the accident happened. If it was the automobile driven by the respondent on the way to the place, and on the journey during which the accident happened, then such testimony may be considered within the purpose I shall point out. The speed of the automobile cannot be reproduced or described to you as it appeared to the witnesses except by an expression of its speed in miles per hour. The weight to be given such testimony rests with you, and you should have in mind the opportunity or lack of

opportunity, if any, a witness had for forming a fairly reliable judgment of such speed so witnessed. And you should remember that such estimates of speed are no more than opinions, and not even claimed to be absolutely correct, and cannot in the nature of things be exact; and it rests for you to judge what weight you will give the same. The speed of the automobile before it made its approach near enough to Mary Robb to call upon the driver to reduce its speed to that of not to exceed 10 miles an hour has no bearing upon the issues before you, except as it may or may not show a recklessness and wantonness in respondent on that trip and continued up to, and explanatory of, the accident."

Aside from the time when the witness Foster testified that he saw an automobile pass his house, there was nothing tending to show the identity, except that the car about which he testified was a red automobile, with a black top, and that there were two persons in the car. In a much traveled public street like the one in question, we think it unsafe to leave to a jury testimony of this nature. The rate of speed testified to by the witness Foster at this point was a high rate of speed of 40 miles an hour. Not only was it remote in point of distance from the place of the accident, but it was so vague and indefinite as to identity that it sent the jury into the field of speculation as to whether the car which Foster saw was the respondent's car or not. The minds of the jury may have never met upon this question. Some jurors may have believed it to have been respondent's car, and others not. In our opinion the receiving of such evidence was prejudicial error.

3. This brings us to the charge of the court, and presents the most important question which we have to consider in the case. The court seems to have submitted here to the jury the bald proposition that if, at the time the respondent struck the deceased, he was operating his car in excess of 10 miles an hour,

he was guilty of manslaughter, for there is no doubt that the respondent's car did strike or run over the deceased and cause her death. In our opinion this eliminated from the case all question of the proximate cause of the death of Mary Robb, and also eliminated the question as to her conduct or action on the occasion. As the court well instructed the jury, the rate of speed at which the car was being operated at any point was matter of opinion or judgment. We have here the positive testimony of the respondent that he was not running at the time to exceed 8 or 10 miles an hour. From aught that appears in this record, the injury might have occurred just the same if the respondent had been running 9 miles an hour as it would were he running 11 miles an hour. The charge eliminates from the case all question of whether the respondent, in good faith, believed he was running within the statutory limit, and makes a mistake of judgment on the part of respondent amount to a crime. While it is not the law that, in order to convict the respondent, it must be made to appear that he knowingly violated the statute, because he is bound to know the law, yet there is authority to the effect that he must have been aware, in order to be convicted, that he was doing the unlawful act complained of. We know of no case that goes so far as did the charge of the court upon this subject. *People* v. *Fitzsimmons* (Sess.), 34 N. Y. Supp. 1102; *State* v. *Jackson,* 103 Iowa, 702 (73 N. W. 467).

In the last-cited case it was held that there must have been the intention to do an unlawful act, and that such act resulted in the homicide.

The mere running of an automobile upon the public highway is not of itself unlawful. Can the mere fact that the jury found that the respondent exceeded the legal limit of 10 miles an hour at this particular point be of itself, independent of other facts connected

with it, sufficient to warrant a conviction? We think the better doctrine is that the question of the speed of the automobile should have been submitted to the jury, in connection with other facts, as bearing upon the question whether he was guilty of gross negligence in the manner in which he ran the automobile.

This. court held, in the case of *Zoltovski* v. *Gzella*, 159 Mich. 620 (124 N. W. 527, 26 L. R. A. [N. S.] 435, 134 Am. St. Rep. 752), that the absence of a light on an automobile, in violation of the statute, was evidence tending to prove negligence; and it has been held in other courts that a failure to display headlights or sound a horn, as required by statute or ordinance, or both, constitutes negligence. *Ballard* v. *Collins*, 63 Wash. 493 (115 Pac. 1050).

While it might be said that the wilful violation of this statute would constitute negligence, it does not follow that such negligence would in a given case amount to gross negligence or manslaughter, under the circumstances of the case.

It was held by the supreme court of Nebraska in *Schultz* v. *State*, 89 Neb. 34 .(130 N. W. 972, 33 L. R. A. [N. S.] 403, Ann. Cas. 1912C, 495), that one who drove an automobile wilfully, recklessly, carelessly, and negligently, *and* at a rate of speed forbidden by the statute, upon the public streets or highways of that State, and *thereby* caused the death of another, was guilty of criminal homicide. In that case, as here, the trial court called the jury's attention to the statute, and the supreme court said, in commenting upon that charge, as follows:

"It will be observed that this case is not prosecuted solely for a violation of the speed limit fixed by the statute, but is based in fact on the negligent, reckless, careless, and dangerous driving of his automobile by the defendant. In a recent case in Connecticut the defendant was found guilty of manslaughter in negli-

gently and recklessly driving his automobile over a
man named Morgan. In that case the court took
occasion to read to the jury the automobile act of that
State, which is quite similar to the statutes of
Nebraska regulating the use of automobiles on public
streets and highways. It was claimed that it was
error to read those statutes and apply them in that
case; but the supreme court of Connecticut found no
error in the instruction. It was there said:

"'One who wilfully drives an automobile in a public street of
this State at a rate of speed or in a manner expressly forbidden
by statute, and *thereby* causes the death of another, or one who,
with reckless disregard for the safety of others, so negligently
drives an automobile in a public street as to cause the death of
another, is guilty of criminal homicide.' *State* v. *Campbell*, 82
Conn. 671 [74 Atl. 927, 135 Am. St. Rep. 293, 18 Ann. Cas. 236]."

There seems to be no conflict in the decisions where
the respondent is violating some statute, *and* where
his manner is negligent and careless; the courts in
such cases uniformly hold that he is guilty of man-
slaughter, if the death of some other person is the
result.

Did the fact, if it be a fact, that respondent, at the
time his automobile struck Mary Robb, was driving
his automobile more than 10 miles an hour *thereby*
cause her death? In other words, might not the death
have occurred had the automobile been driven at 9
miles an hour? Did the unlawful rate of speed cause
her death? We shall split no hairs as to whether the
unlawful act to warrant a conviction of manslaughter
must be one that is *malum in se,* as distinguished
from *malum prohibitum.* Many courts do not recog-
nize any distinction where the unlawful act is in its
nature dangerous to human life, or where the unlaw-
ful act manifests an evil nature or wrongful disposi-
tion to harm or injure another in his person or prop-
erty. See note to *State* v. *Horton,* 139 N. C. 588 (51
S. E. 945, 1 L. R. A. [N. S.] 991, 111 Am. St. Rep.
818), found in 4 Am. & Eng. Ann. Cas. 800.

In the *Campbell Case* the court said:

"The rule of law concerning contributory negligence by the injured person, as a defense in civil actions for damages for personal injuries, had no application to this case. The State was required to prove the alleged unlawful act of the accused and its consequences, but not that the deceased exercised due care to avoid the consequences of that unlawful act. The court did not, either by its refusal to charge as thus requested, or by the language used, give the jury to understand, as the defendant claims it did, that the conduct of the deceased was eliminated from the case. The court properly said to the jury that the State must clearly show that the deceased's death was the direct result of the defendant's negligence, but that the injured man's conduct became material only as it bore upon the question of such negligence of the accused, and that if the culpable negligence of the accused was the cause of Mr. Morgan's death, the accused was responsible under the criminal law, whether Mr. Morgan's failure to use due care contributed to his injury or not."

So we say here that, while the claimed contributory negligence of Mary Robb is no defense in this case, yet it does not follow that her conduct should be eliminated from the case; it should be considered as bearing upon the claimed culpable negligence of the respondent, and the question should all the time be: Was respondent responsible under the law, whether Mary Robb's failure to use due care contributed to her injury or not?

Eliminating the questions of recklessness and gross carelessness from the case, would it be claimed here that, because respondent was by one mile per hour exceeding the legal speed limit, he would be responsible for the death of Mary Robb, if in her excitement and confusion she jumped in front of the car at a time when it was physically impossible for the respondent to stop it before inflicting the injury? Would the mere fact that a car was being operated slightly in

excess of the legal speed limit make a respondent guilty of manslaughter if a person wilfully threw himself in front of the car and received injury? To ask these questions is to answer them in the negative. On the other hand, if this respondent were operating his car at the rate of 9 or 9½ miles an hour carelessly and negligently, and should by reason of gross negligence run over a little child sitting in the street, killing it, nobody would expect that he would be excused for his unlawful act. He could not claim that, because he was not violating the speed limit, he was not guilty of wilful and gross misconduct in causing the death of such child.

Did the death of Mary Robb occur as a direct and natural result of the exceeding of the speed limit by the respondent? In most of the cases cited, where it has been held that one who caused the death of another, while engaged in an unlawful act, was guilty of manslaughter, it appeared that the death resulted as the natural, direct, and necessary result of the unlawful act as, where one unlawfully assaults another and knocks him down, and, he falling upon some object, breaks his neck, the result is the natural, direct, and necessary result of the unlawful act; so it is in the cases of the careless use of firearms, where the unlawful act itself was wilfully performed, and was the natural forerunner of the resulting injury. The cases cited by the prosecution all bear out this proposition. The case of the unlawful administering of drugs is another instance of the application of the doctrine referred to. On the other hand, attention is called to the case of *People* v. *Rockwell*, 39 Mich. 503, where a person was convicted of manslaughter for killing one Wilber; the respondent was shown to have struck Wilber with his fist and knocked him down. It was not shown directly how Wilber was killed; but it appeared distinctly that the blow did not kill him. The

facts indicated that Rockwell kicked him after he fell, or else he was killed by a horse trampling on him. This court, upon reversing the conviction on the charge of the lower court which was unqualified, that if the blow was not justifiable, and Wilber so fell that the horse jumped and struck Wilber and killed him with his feet, or kicking him, respondent was guilty, said:

"It is impossible to maintain such a charge without making every one liable not only for natural and probable consequences, but for all possible consequences and circumstances which immediately follow a wrongful act. There was no necessary connection between the act of respondent and the conduct of the horse, which he cannot be said from the record to have been responsible for. And the case was not even put as permissive. The liability was laid down as positive. The conviction cannot be maintained."

So we say here, the charge of the court eliminated all necessary connection between the speed of the car and the death of Mary Robb.

In the case of *Potter* v. *State,* 162 Ind. 213 (70 N. E. 129, 64 L. R. A. 942, 102 Am. St. Rep. 198, 1 Am. & Eng. Ann. Cas. 32), it was held that the death of one of the participants in a friendly scuffle through the accidental discharge of a pistol carried in the pocket of the other, contrary to the provisions of the statute, could not be said to be caused by the performance of a wrongful act, so as to render the one carrying the pistol guilty of manslaughter, under the provision of the statute that whoever unlawfully kills a human being in the commission of some unlawful act is guilty of that crime. The court there said:

"It is undoubtedly true, as a general rule of law, that a person engaged in the commission of an unlawful act is legally responsible for all of the consequences which may naturally or necessarily flow or result from such unlawful act. But before this principle of law can have any application under the facts

in the case at bar, it must appear that the homicide was the natural or necessary result of the act of appellant in carrying the revolver in violation of the statute. * * *

"With equal reason and force it may be asserted that the mere fact that the accused was unlawfully carrying the weapon in question at the time it was accidentally discharged is not, under the circumstances, a material element in the case, for it is manifest that such unlawful act did not, during the scuffle between the parties, render the pistol any more liable to be discharged than though the carrying thereof had been lawful."

It was held in this State, in the case of *People* v. *Abbott,* 116 Mich. 263 (74 N. W. 529), that a person who, while doing or attempting to do an unlawful act, dangerous to human life, accidentally kills another is guilty of manslaughter at least, even though the act was not unlawful at common law. So held where the death of a woman pregnant, but not with a quick child, resulted from an attempt to procure a miscarriage by means of instruments, made punishable as a misdemeanor by statute.

We think there is a clear distinction in principle between that case and the instant case.

In this case, in order to warrant the conviction of the respondent, it should have clearly appeared that Mary Robb's death ensued as a direct and natural result of the reckless or gross negligence of the respondent. The crime sought to be proven was involuntary homicide, caused by culpable negligence, and, to make an act carelessly performed resulting in death a criminal one, the carelessness must have been gross, implying an indifference to consequences; and the term "gross negligence" means something more than mere negligence. It means wantonness and disregard of the consequences which may ensue, and indifference to the rights of others that is equivalent to a criminal intent.

Not every degree of carelessness or negligence, if death ensues, renders the party guilty of manslaughter. The case may be one of mere misadventure. To warrant conviction, it must be gross negligence. It has been well said that there is little distinction, except in degree, between a will to do a wrongful thing and an indifference whether it be done or not. Therefore gross negligence is criminal, and within limits supplies the place of affirmative criminal intent.

An unavoidable crime is a contradiction. Whatever is unavoidable is no crime. As in the law of civil wrongs, so in the criminal law, to render one answerable for an offense, it must result from his act as an effect not too remote but sufficiently proximate thereto.

To warrant a conviction of manslaughter, the conduct of the accused must have been the proximate cause of death, and must have been characterized by such a degree of culpable negligence as to amount to gross negligence; and that is a question for the jury.

The ultimate inquiry should be: Was the respondent criminally negligent, and, if so, did his criminal negligence cause the death of the deceased? *State v. Goetz*, 83 Conn. 437 (76 Atl. 1000, 30 L. R. A. [N. S.] 458).

We are of opinion that there was reversible error in the charge.

We have examined, but shall not discuss, the other assignments of error. Many of the questions discussed by counsel will not probably arise upon another trial in view of what we have said, and some of them are without merit. For the errors pointed out, the conviction must be set aside and reversed, and a new trial granted.

MCALVAY, C. J., and BROOKE, KUHN, BIRD, MOORE, and STEERE, JJ., concurred. OSTRANDER, J., did not sit.